# OCTOBER TERM, 1872, AT DETROIT.

## (CONTINUED FROM VOLUME XXV.)

————◆————

### Cornelius L. Russell v. Albert Miller and another.

*Title to lands: Partnership: Bill in equity: Agreement: Proofs.* Where lands purchased in the name of one partner, are alleged to have been bought with money advanced by the firm under an express agreement that the firm should own them, a bill filed by another partner to enforce the agreement, cannot be maintained unless such express agreement is made out by proof.

*Partnership funds: Resulting trust.* Complainant cannot, under such allegations, rely on the theory of a resulting trust arising out of a purchase with partnership funds, without any agreement to buy for the joint benefit.

The facts in this case did not sustain either an agreement or a purchase in fraud of the partnership.

*Admissions: Conflicting testimony: Conduct of parties: Inferences.* Where there is conflicting testimony as to the admissions of parties, it is safer to trust to the inferences to be drawn from their conduct than to attempt to reconcile such a conflict without regard to their conduct. Their acts clearly shown are more reliable than any recollection of their words.

*Acquiescence: Evidence: Laches.* The acquiescence of complainant in the dealings of defendant under circumstances which required different conduct if the former really claimed any rights in the property in dispute, and his failure to assert any rights until the property had become valuable and circumstances had changed, not only operated as strong proof that his claim was ill-founded, but also showed such laches as would disincline a court of equity to entertain his suit.

*Heard July 8, 10, and 11. Decided October 22.*

Appeal in Chancery from Bay Circuit.

*Marston & Hatch,* for complainant.

*Webber & Smith, J. G. Sutherland, C. I. Walker,* and *G. V. N. Lothrop,* for defendants.

CAMPBELL, J.

Complainant has brought this suit to establish his right

to an undivided two-thirds interest in certain tax-title purchases in Portsmouth, Bay county, which he alleges were made by defendant, Albert Miller, on behalf of the firm of Russell, Miller & Co. (in which complainant and Lyman Crowl were his partners), but which, it is claimed, Miller took in his own name, in fraud of his partners, and has since so disposed of that the other defendant, his wife, who now holds the title, is bound by the original equities.

The case relied upon by the bill, is one of fraud and implied trust, and it sets up the following facts: That in the year 1849, complainant and said Miller and Crowl entered into partnership to carry on the lumbering business, embracing the manufacture and sale of lumber, and the purchase of real estate in connection therewith. The business was to be conducted on equal terms, Miller and Crowl residing at Portsmouth and attending to business there, and Russell residing in Cleveland. That the articles of partnership were not reduced to writing, but the business was conducted on verbal terms; and logs and real estate were purchased to a large amount, for the purpose of carrying on the business.

The bill proceeds to aver, that in the summer of 1850, learning that certain real estate in Portsmouth had been bid in by the state for delinquent taxes, and that the state titles could be obtained for principal, interest and costs, an agreement was entered into between the three partners, that the firm should buy the titles, to be paid for by and conveyed to the firm, as partnership property.

That on September 26th, 1850, in accordance with said agreement, Miller drew on Russell for three hundred dollars, to purchase and pay taxes on these lands, to be charged to partnership account, and Russell paid said draft.

That on September 28th, 1850, Miller, in accordance with the agreement, paid to the state seventy dollars and

seventy-four cents, and received a certificate of purchase for eighty-one blocks described in the bill, sold for taxes of 1846.

That on the 28th of September, 1851, for twenty-nine dollars and thirty-four cents, he purchased, in pursuance of said agreement, state bids on the taxes of 1847, for forty-five blocks, all but five of which were included in the previous year's purchase.

That in May, 1851, Miller informed Russell, that in order to make the previous purchase good, it would be necessary to pay ninety-nine dollars for delinquent taxes of 1845, on which lands had been bid in by the state, and Russell paid the same to the auditor general, for forty-seven blocks included in the first purchase and described.

That Russell, when he made this last payment, did not know that Miller had taken the earlier certificates in his own name, but supposed they were in the joint names. That on June 30, 1851, the auditor general deeded to Miller the titles for 1845, which conveyance is not recorded.

That in the spring of 1852, the partnership was dissolved by mutual consent, being largely indebted, and Russell agreed to pay, and has paid the debts, in consideration that he should have all the assets. That Miller was to retain his undivided one-third in the lands purchased of the state, except as to blocks nineteen and twenty, which he conveyed to Russell. That in pursuance and part performance of this agreement, Miller assigned his interest in the personalty to Russell in writing.

That at the dissolution, complainant did not know Miller had taken the certificates in his own name, but supposed them to be in the firm or joint name.

That Crowl, May 15, 1852, by written instrument, conveyed to complainant, all his "interest in and to the real

estate, both legal and equitable, of the said firm of Russell, Miller & Co."

That on December 18, 1852, the auditor general conveyed by deed to Miller, the titles for 1846 and 1847, the former of which was recorded in February, 1856, and the latter in April, 1858, and that this was contrary to the agreement for joint conveyance, and without complainant's knowledge or consent. That complainant did not know or suppose these deeds were so drawn, until about January 1, 1855, and did not know or suppose the deed for taxes of 1845 was so drawn, until February 6, 1865. That the transaction was fraudulent, and Miller refuses to convey to Russell his two-thirds interest.

The bill then sets forth a conveyance by Miller to Wm. Daglish, September 10, 1855, by him to John T. Daglish, March 13, 1858, the execution by John T. Daglish to Miller of a power of attorney to convey; a conveyance under it to Wm. Daglish, March 26, 1860, and on the same day from Wm. Daglish to Mrs. Miller, all of which are alleged to be without consideration and fraudulent, and that Miller has always been in possession, and the property is now worth five hundred thousand dollars.

To avoid confusion of issues, it is to be observed on this statement, that the bill puts the case upon two main facts: *first,* the agreement in the summer of 1850, to purchase these lands for the firm; and *second,* the purchase and conveyance for Miller's behoof instead of for the firm, in fraud of that agreement. The ignorance of complainant is set up to explain his inaction.

The answers deny the agreement set up in the bill, and aver previous interests of Miller, to protect which he purchased the tax-titles which it is claimed are invalid, and that the company never owned or claimed any lands at

Portsmouth, except the lot on which their first mill was built and blocks nineteen and twenty; that Crowl made no conveyance to Russell covering any other interests in Portsmouth; admit there were negotiations, and talk about an arrangement for other lands in the plat, but that no bargain was completed, and that Russell never set up, any claim until recently, and paid no taxes, and did no other act indicating ownership until the time of bringing this suit. Reference is also had to certain outstanding titles and transactions which, so far as may be necessary, will be referred to in connection with the facts.

Although the record is very long, and a great deal of testimony has been taken, the portions of it essential to the merits do not disclose very numerous facts; and much obscurity has been caused by the needless prolixity of the examinations and cross-examinations of witnesses. There is a great mass of repetitions and redundancies which could have been omitted without leaving out any fact bearing upon the controversy. The very exhaustive arguments of counsel have pointed out every thing essential, and it will not be necessary, in giving our views, to give more than an outline of the facts on which we base our conclusions. To understand them it will be desirable to explain the condition of things when the partnership was formed.

In 1836, Albert Miller, the defendant, owned so much of the lands afterwards platted into the village of Portsmouth as would include the property now in controversy. He sold several undivided interests, taking back mortgages, which he claims, and complainant denies, remained unpaid and belonging to him. He and the other owners finally conveyed to trustees for a joint stock company, called the Portsmouth Company. The village appears to have been a mere paper town, and the company seems to have

become dormant, very little of the property, except some river lots, having been disposed of, and the stockholders having become scattered, and mostly bankrupt or dead. Miller was a considerable stockholder, retaining an interest of from a tenth to a seventh part—the proportion being difficult to ascertain. The lands do not appear to have been of any value beyond farming lands, and the whole plat was assessed at one dollar a lot, or about eight dollars an acre. There was a mill-lot and mill, to which the record shows the title was good, and vested three-eighths in Miller and five-eighths in Russell and Crowl, and this was the first inducement to the partnership, in which Miller and Crowl were expected to do all the active work in Michigan, and Russell was to manage the finances and dispose of the lumber, his residence continuing to be in Cleveland. The original partnership agreement involved no real estate in Portsmouth beyond this mill-lot, and possibly certain adjacent property on blocks nineteen and twenty, though this does not appear.

Miller and some others who had interests in the Portsmouth speculation, had for several years been protecting their interests by an informal arrangement, whereby each was to consider certain parts as his special property, and one of the government divisions of about forty acres, including the mill premises and Miller's dwelling, was the part that he appears to have regarded as corresponding to his share. Under these arrangements, which were not written, and which were somewhat loose, the payment of taxes or purchase of tax-titles on the whole property was contemplated, with releases or conveyances on equitable terms among the respective claimants, of their portions. They acted on an apparent design of making an informal partition, to ripen into a title in the future by possession and acquiescence.

There were certain difficulties in the way of making a legal title by partition or otherwise, which arose out of different considerations. The property was not valuable enough to warrant expensive litigation. The parties interested were scattered and unknown. These obstacles were then the most serious. The title of record was imperfect, as the land had been improperly described by the first grantor, who had gone into bankruptcy, and the mistake could not be rectified in equity without bringing in every one interested, which would have been expensive and difficult. The principal claimants expected to trust to getting tax-titles and releases from as many as could be found, and to the course of time, to remove any further claims. In case of a suit in partition bringing in all the persons interested, Miller would have had a strong equity to have set apart to him the land he selected. But, in order to protect any interest, it was essential to provide that no tax-title on any part of the plat should fall into unfriendly hands. Each equitable tenant in common was concerned in protecting the whole estate.

The case shows, without any controversy, that both before and after the creation of the partnership, Miller had been constantly devising how to complete the title, and that it was thought important to get up the scattered interests as far as possible, as well as to secure protection against or under tax sales.

The bill does not allege, and the evidence does not show, that the partnership was originally intended to have any interests in Portsmouth beyond those dependent on the mill property. Whatever interests Miller had were to be left untouched. Acquisitions of additional land were talked of, but not provided for. The bill makes no claim of any.

The only parcel to which there was any clear title was the old mill-lot. The taxes on the rest of the property for years previous to 1844 were paid or provided for, or tax-

titles obtained under arrangements with various parties which then had ceased, and Miller was obliged in 1848 to procure tax-titles for 1844, which he did on so much of his forty-acre fraction as had been sold for that year, that being the share he desired especially to protect. Upon several blocks, including 19 and 20, he allowed no consecutive tax sales to become absolute, but paid or redeemed. Upon these two blocks he is shown to have but one tax-title and his equitable title, and the same appears as to other blocks in the same fraction. He evidently regarded them as his own, and acted on that theory.

Immediately after the partnership was formed, steps were taken to build a new and larger mill, and to make certain other partnership improvements on blocks 19 and 20, and, according to some of the proofs, on some other blocks. This new mill was begun before it is averred any agreement was made to buy the tax-titles set up in the bill; and it must have been done in reliance on such title as Miller already possessed.

The testimony in regard to this agreement, as introduced by the complainant, consists of positive testimony of complainant himself, of letters of defendant, and of admissions. It is met by the oath of defendant, and by various facts, partly circumstantial, in opposition.

Complainant testifies that the arrangement was made in the latter part of August, or first of September, 1850. Defendant was to go to Lansing and buy the interest of the state for the company in certain lots and blocks in Portsmouth, unless they were taken by some one else, or redeemed. On his way to Lansing, Miller wrote to Russell concerning his intentions, and on the first of October, on his return, he reported what he had done. Letters written in April and May previous are also referred to as showing what was designed to be done.

Miller says that all the arrangements were made on his

own account, and to protect his own titles, in a portion of which it had been understood the company might, if they chose, in future become interested when he could make title, but that no such arrangement was ever made.   This is the substance of the denial so far as it is here material. And, without at present going into the collateral testimony, it is important to know how the parties stand affected. by such facts as have thus far appeared.

The lands which the bill seeks to reach are in part lands on which defendant Miller already had a tax-title, and on some of them he had paid taxes, or redeemed from previous tax sales.   The majority were parcels which he did not. own, except by his equitable interest in the plat; but in a portion he had asserted distinct claims.

There is no testimony in the case showing what lands Miller was to buy, if such an agreement was made.   His previous letters had been very general, and there is nothing intermediate.   The bill does not show that these letters had any part in coming to the agreement.   The first letter shown is one written to Crowl, and not to Russell, dated at Saginaw, April 10, 1850, and chiefly devoted to other business.   In it occurs this passage, which is all that appears on the subject:  "I met E. H. Thompson a few minutes ago.   He informed me that the legislature had passed an act legalizing most of the former tax sales, and thought that Portsmouth matter would be safe for the present, at any rate, under the act; but he informed me that there were back taxes due the state, which would hold good to any one purchasing from the state.   I think that cannot be the case with any that I hold, but it should be attended to, and as soon as you get back we must be prepared to see to it; and if there are other portions of the property that can be got hold of, we must be prepared to buy it in."

26 MICH.—2.

It should be remarked here that Miller testifies that he had made an arrangement very early with Russell to be allowed to draw for his private credit to the amount of one thousand two hundred dollars, if necessary, to use for his tax matters, and other private necessities, and that his partners had expressed a willingness to help him clear up his titles, and he does not appear to have ceased or changed his existing arrangements for that purpose.

The letter of May 21, 1850, to Russell, who was the person relied on for advancing all funds, contains but one sentence which can have any reference to lands, and it is not clear that it refers to land at all. But it probably does. Miller writes at the close of a letter in regard to lumber matters: "*I hope we shall be able to secure a larger interest than we have at present. That is confidential, however.*"

Russell does not claim to have received any other letter or to have seen the letter to Crowl, before the alleged agreement. His statement in his testimony, that Miller had corresponded with him on the subject, is not verified. This letter could have given him no light whatever.

The letter to Crowl, however, as it does refer to some action to be had about tax-titles, is not irrelevant, and it is important to see just what it means.

Inasmuch as at this time the firm had no title to any portion of the plat (except the old mill-lot, which was never in dispute), and had invested no money on any block except nineteen, where the new mill was placed, they had no interest at all in the main part of Miller's communication beyond that. The letter, which is a hasty one, written on the occasion of information just received, and not upon any theory or plan, is manifestly called out by anxiety, not to obtain new titles, but to save the old, which were private and not firm property. The information given by Thompson, must have referred to a supposed removal of

the difficulties attending the original title, and thought to be rectified by a new paramount title by tax-sale. The state bids, Miller evidently supposed did not reach his lands, but in this it turned out he was partially mistaken. The closing suggestion of buying in other portions, is the only one looking to any new acquisitions, and is not only hypo-thetical, but may, from the context, apply as well to the previously recognized policy of getting up all proprietary titles that might affect the ownership of the plat, as to that of acquiring new and adverse claims. Had this been regarded as a serious proposition, meant to be acted on, that the firm should embark in new speculations, it is quite evident from the general course of business, that Russell, and not Crowl, would have been most fully informed, whereas in writing to Russell, no allusion is made to any specific project. The letter is hasty and could have formed no part of any agreement, and is not charged as doing so.

If this letter to Crowl does refer to Miller's private interests, partly or wholly, it corroborates his testimony in regard to the subsequent action at Lansing, and is not in harmony with Russell's statements. The latter, from first to last, makes out the whole arrangement, and not merely a part of it, to have been for the company; and demands in his bill, not only the lands Miller never had owned or claimed before in severalty, but also those that he had pre-viously claimed. And this ground is the only one he could take, for there is nothing whereby the arrangement can be made out from the proofs, to have been partly joint and partly several, and there is nothing to identify any lands at all, until Miller should purchase.

Miller admits his willingness to let the company have lands, if they wanted them. But there is nothing to indi-cate he was to give the firm any of his private property without being paid for it. There is no question of his

having claimed private ownership in several of these specific blocks, and of his having expended his own money in paying taxes or buying tax-titles on them. There is as little doubt of his having a good claim in equity to an interest of a tenth or more in the entire village plat, and there is evidence, although disputed, of his holding a mortgage interest in half of it, large enough at its then value to absorb it. If this purchase in 1850 was made for the company, it was to be a purchase to which all his previous rights were to be subjected without remuneration. The arrangement does not seem a probable one.

But its probability does not depend merely on these considerations. Both parties rely more upon other circumstances. And complainant introduces the letters just before and after the Lansing visit, as part of the *res gestae.*

The letter of September 26, 1850, of even date with the draft for three hundred dollars (so far as it bears on the tax purchases), is as follows: "I am now on my way to Lansing, with a fair prospect, I think, of securing a large share of the Portsmouth village property. I have to be in Lansing on the 30th inst., and the first day of October, in order to *redeem on the 30th, or purchase on the first. If money has been deposited ahead of my arrival for the purchase of the property, then my alternative will be, to redeem; and the person holding the former tax-title will deed to us a portion of the property. If there is no one before me, I can purchase the state title after the time of redemption has run out, with an understanding to deed a portion, in that case, to the holder of the former tax-title."*

The letter of October 1st, 1850, is as follows; and is dated at Detroit:

"I am here on my return home sooner than I expected when I wrote you from here last week,—having accomplished all I expected to by staying in Lansing till after

the redemption of lands had expired. C. L. Richman and Seth Willey entered into an arrangement with G. D. Williams last year, by which they were to pay all the back taxes on Williams' portion of the Portsmouth property, and receive each a third interest with him in the title of the property. Last year they only cleared it of what taxes would be past redemption that year, and let the rest go. When it came near the time of sale this year, Williams' friends told me that Willey and Richman were preparing to come a game on Williams, by bidding the land in their own name, as it would be bid off to the highest bidder, and Williams was not prepared to compete with them; and that an evidence of their intention to do that, would be their neglect to buy the state bid, or to redeem. I went to Lansing on the last days before the redemption expired, so that I could take the state bid if they did not. They have paid no attention to it at the auditor's office, and I have purchased the state bid for taxes of '46 and '47 on all Portsmouth, except Fraser's, and some other lots on which taxes have always been paid, and if they should not be redeemed by Richman and Willey at the county office during my absence, we can have a deed· to-morrow for the whole, with an understanding with Williams' friends that we should take Richman and Willey's place in the last year's arrangement. The title of our forty is all right."

It is to be noticed in regard to these letters, that neither of them refers to any agreement under which Miller was to act, and that what he was to do, and what he did, if any agreement is assumed, was very different from the agreement set up in the bill. That was a simple agreement to purchase out and out certain property in which the firm had no existing interest. The letter of September 26th proposes to redeem the entire property (whatever it may have been) that was in Miller's contemplation,

unless he could purchase it, with an expectation that the holder of the former tax-title would deed a portion. It also shows that if Miller obtained the whole state title he was in like manner to deed to the holder of the former title. If this was in pursuance of any agreement, it must have been with some one else than the complainant. It can only be explained by supposing that some of the persons interested in the plat expected to respect each other's claims and to act in harmony, as the evidence shows they had done to some extent before. But there is nothing in the case made by the bill, or in the testimony, which explains how the firm could have an interest in redeeming the whole plat, or any considerable part of it, if any.

The case shows positively that the Williams lands, which formed an important part of the purchase, were not thought of until just before Miller went to Lansing, and that the arrangement in regard to them could not have been made with complainant, or by his procurement.

The bill is not framed on any theory that Miller created a constructive trust in favor of the firm by misusing partnership funds. It rests entirely on the ground that he expended funds under an express agreement, and that the fraud consisted in not taking title in the common name.

Reference has already been made to the fact that Miller speaks of an informal understanding that the firm might, if they chose, become interested in any of the Portsmouth property. If this was true, then most of the references which appear to bear upon an agreement would readily be explained. The business was very loosely done at best, and the intrinsic probabilities are about as strong one way as the other, apart from positive testimony. We have no means of weighing the testimony of Miller and Russell, except by comparing other proofs. The denial of one is in itself as weighty as the assertion of the other. The

present value of the land, too, is of no consequence in leading to a conclusion as to affairs in 1850, because at that time the land was almost worthless for present purposes, and not sought after by any one.    There is no strong reason apparent why Miller should not then have been willing to let his partners join in the trade, and there is no apparent reason why they should have desired it. But one very significant circumstance is, that neither Russell nor Crowl appears to have suggested any purchase, or taken any active part in procuring one.    Miller is throughout the person desirous of moving, and he had interests in the whole tract which needed protection.

It is not pretended anywhere that, before this alleged arrangement in the summer of 1850, the firm had any interests beyond the mill property.    But as early as March, 1850, Miller speaks in his correspondence of improvements "we" are making in farming and clearing, and purchasing oxen, paid for by draft on Russell, all of which was evidently then supposed to be on his own account.    The use of "we" instead of "I" is a very common colloquialism, and of small significance.    In the same letter, concerning the same lands that were being improved, he writes to Russell in a way quite inconsistent with any joint claim, and, as already stated, none was then asserted.    He says: "there are others interested with me in settling the Portsmouth title; there has been some arrangements made with counsel to put the matter in operation.    I intended to have learned all that had been done, before writing, but have not had time since I came up.    I think there will be no more difficulty in the matter, but I am very anxious, as well as yourself, to have it settled before its real value is appreciated."    This letter throws light on the letter written in April to Crowl, after the interview with Thompson, and it corroborates Miller's statements of the proposition to

make some arrangement for selling to the firm such land as they might want when his title was cleared up. It would explain also the interest taken by Russell and Crowl in aiding him to complete this task. It seems far more consistent with the whole facts than the case made by the bill, and serves better to harmonize the testimony of statements and admissions, which are so diversely stated, as, on any other theory, to compel us to believe there has been more perjury than we think at all likely to have been committed.

It is not important to consider whether the statute of frauds would apply to such an arrangement as is asserted, as that defense is not relied upon. But the wisdom of the statute is manifested by many things in this record, which show that, allowing all parties credit for reasonable honesty and intelligence, they must have greatly misunderstood each other, and each have been ignorant of the views of the other. Where parties have had verbal conversations concerning property of small value, and it afterwards becomes of great value, their recollections are apt to be biased by the rise, and a very vague talk may became transformed into an agreement, without the interested party being conscious how far he has deceived himself. This tendency is so familiar that we can put little reliance on the acts or statements made after the value has begun to increase.

The testimony, anterior to the purchase at Lansing, being unsatisfactory to establish a contract, we are required to examine into the subsequent acts and statements of the parties.

It is not claimed that Miller meditated fraud when he went to Lansing. The contrary is conceded, and it is impossible to suspect it. The only fraud set up in the bill is in taking the title in his own name instead of for the firm. And this is the only one sought to be shown

by the proofs. The case made by the bill would also fail unless this fact had been studiously concealed from Russell and Crowl. Any knowledge of the real state of things would show such an acquiescence on their part as to show the contract could never have been made as claimed.

As all purchases from the state become matters of public record, such a method of fraud, though possible, is not very likely. If not discovered at once, it must be as soon as there are any dealings with the land. And here those dealings could not be expected to be postponed very long, and were not in fact postponed. There is no significance either way in the purchases and redemptions of 1851. Both parties rely on them to support their several theories. But the purchases of 1850 are the only ones really in controversy. The others are dependent on the first, and the conduct of the parties is no more significant as to the one than as to the other.

The testimony of Clark, first introduced to show Miller's statements concerning joint ownership, is very positive, that a few days after Miller's return from Lansing, the fact of his purchase in his own name was brought to Crowl's attention by a sale and conveyance made individually, and Clark swears it was then said by Miller to have been put in his name by mistake in the auditor's office, and that he proposed to retain it for convenience. He also says Russell told him Miller was to give him a deed of a certain lot which Miller had said Russell was to convey. Clark's evidence is not very reliable, or harmonious with other witnesses, upon other known facts in the case. But this fact was put in evidence by complainant, whose own testimony up to a certain point, asserted a very similar theory. Complainant repeatedly asserted promises by Miller, and an expectation on his own part, that the former should convey to him his interest. He afterwards corrected this

26 MICH.—3.

as a mistake, and said he understood the title stood in the names of all three. This, therefore, must stand on other facts established.

It appears from his testimony, that he made frequent and anxious inquiries of Miller as to the deeds, and that their non-reception was a source of trouble and annoyance. Enough is said on this point to indicate that Russell, if interested, must have been credulous and negligent to the last degree, in not finding out the facts, and Miller equally fatuous in supposing they could not be discovered at any time by a simple inquiry at the auditor's office. But the intrinsic improbability of such a delusion appears from other facts. Russell was not only a practising lawyer, but was relied upon as the responsible business man of the firm. His conduct, as he states it, is not consistent with either character, and is hardly credible.

In October, 1852, Russell witnessed a deed made by Miller to Jesse M. Miller, and at the time asked if the latter was getting a deed of his lots, showing a knowledge that the land was within the purchase, and the title in Albert Miller. The evidence shows that sales were being made and buildings put up constantly, and in such a way as to be notorious, but Russell in no way interfered. In May, 1852, the firm dissolved. Russell was to have the firm assets, and he had an assignment from Crowl, in general form, of his interest in realty and personalty. It described no property, and was not in shape to be recorded. Russell took Miller's quit-claim of the old mill, and blocks nineteen and twenty, giving Miller his notes for about seven hundred dollars. He never got or sought a valid deed from Crowl, so far as the case shows. While, upon his theory, it was natural to ask no conveyance from Miller, of an interest in the remaining property, yet upon the same theory he needed one from Crowl, of that, as well as

of blocks nineteen and twenty. And this suit itself would, perhaps, be defective in not establishing any such transfer, or bringing in Crowl's heirs so as to bind them by the record. No steps were taken for a partition, and no arangements made for the sale of lots, or for the payment of taxes, or for necessary improvements. Russell took no one of the steps that all land-owners are expected, if not bound to do, in regard to a title situated as this was, or as he claims to have supposed it to be.

But there is a very significant circumstance following very closely after the first purchase of 1850. In April, 1851, it became necessary to raise funds for the partnership purposes by mortgage. This was executed on blocks nineteen and twenty, and on most of the premises in the forty-acre fraction. Such a mortgage would be of no value as a security unless made by all holding title to the premises it purported to cover, and no one would touch such a security without inquiring concerning the title. But Russell took it in his own name as mortgagee from Miller as sole mortgagor, Crowl not being a party to it. This circumstance is very convincing as to what Russell then supposed concerning the title. He treated Miller as the legal owner of the whole mortgaged premises.

The bill admits that in January, 1855, he knew the deeds had been taken in Miller's name. About that time he also learned that Miller was in treaty to get from one White, a conveyance to cure the defective description in the original title from Trombley, and supposed Miller was likely to be cheated if he made the proposed bargain, by which White was to have a transfer of part of the lands. On the first of May, 1855, Russell wrote to Miller the following letter, to dissuade him:

"I have investigated the Trombley title, and it is all moonshine. I am in possession of some facts that will

knock them into a cocked hat. They attempted to commit a great fraud upon you. And Mr. Sutherland, your particular friend, has betrayed you. If you have made no conveyance, make none. Take my advice for once, I beseech you. I have never yet advised you to any thing that was not for your interest. Remember that you have a wife and children, who have a right to protection at your hands; and, if you turn a deaf ear to my advice and warning, let their rights plead to you, stronger than I can, to refrain from making the conveyance which these men wish to obtain from you. Time will tell, Judge, who you should have trusted."

Russell himself, if his claims are valid, would have been affected to twice the extent with Miller, by the proposed arrangement with White, and if he had, or supposed he had, any rights in the property, he would have insisted on his own, and not relied upon Miller's risk to authorize this intervention, and would have directed instead of advising. There is no reasonable theory which can explain this letter as that of an owner, legally or equitably, of two-thirds interest in the land referred to. He makes no allusion to any effect such a conveyance could have on himself. At the same time, the fact that he was advised of Miller's intention, shows that Miller could not have been scheming to defraud Russell in these negotiations. And he, if an owner, was the only person who could have been defrauded.

The delay in appealing to the courts for redress, when his alleged rights were daily destroyed or perilled before his eyes, would not only go far to cut off any right to resort to a court of equity for relief, but, connected with the other facts, confirms the defense and contradicts the case on which he relies. Up to the time of filing the bill, complainant has very persistently omitted to take any of the steps that an honest claimant, in good faith, would find

it incumbent on him to take in support of his rights. We can only account for the present bill by the great value of the property and the facility of proving, after this long interval, hearsay statements and admissions, without the whole circumstances on which their just interpretation depends.

The testimony shows many such statements, which, if truly reported, and not looked at in the light of the surrounding facts, would go very far towards making out a purchase for the firm. But the acts of the parties are stronger than their words, even when freshly reported. And throughout the case, Miller appears to have acted openly as proprietor of what was in his own name, and Russell has done the reverse, and acted as owners do not act. The theory of the defense is the most natural, and is, we think, in harmony with the preponderance of testimony. These controlling facts are very clearly made out. We do not propose to express any views upon the character of much of the testimony of Miller's declarations, for most of them, as reported, are explained by the acts of the parties. There is evidently, in this rehearsal of antiquated matters, much inaccuracy and contradiction, and much that could only have been taken at second hand. There is no occasion to impute willful falsehood to any great extent, if at all. But the case has impressed us very strongly with the wisdom of the rule which will not let parties sleep on their equities, and with the danger of disturbing titles on ancient hearsay and gossip.

After a full and repeated examination of the whole record, we fail to discover any title in complainant to relief. The decree dismissing the bill was correct, and should be affirmed, with costs.

CHRISTIANCY, CH. J., and GRAVES, J., concurred.

RUSSELL v. MILLER.

COOLEY, J.

I am of opinion that, if complainant had equities originally,—upon which I express no opinion,—his delay in enforcing them has been such, that the circuit judge was justified, on that ground, in dismissing the bill.