Bosworth and another, Appellants, vs. Hopkins and others, Respondents.

*March 2 — May 2, 1893.*

*Partnership: Purchase of land by one partner in his own name: Resulting trust in favor of the firm.*

1. Sec. 2077, R. S. (providing that when a grant of land is made to one person and the consideration is paid by another, no use or trust shall result in favor of the latter), does not apply to a case where a partner purchases land with partnership funds and takes a conveyance in his own name without the knowledge of his copartner; and the question whether in such case there is a resulting trust is to be determined as before the statute.

2. Whether a trust is to be implied in favor of the firm from an alleged secret or fraudulent use of its funds by one partner in purchasing lands in his own name, depends upon the facts as they existed when the purchase was made, and the subsequent withdrawal of funds of the firm and use thereof in making further payments of the purchase money, interest, taxes, etc., is immaterial.

3. Where it was the understanding between partners that either might withdraw moneys from the firm, consisting of profits earned, for private uses, without encroaching upon the capital, a purchase of

land by one partner with moneys in good faith withdrawn and charged to him on the books of the firm is rightfully made, and he may hold the land for his own benefit.

4. Upon the evidence in this case,— showing, among other things, that at the time $1,000 of the money of the firm was withdrawn by two partners to purchase land in their own names the undrawn profits standing to their credit were about $75,000, while the other partner, who was living abroad, had drawn largely upon the firm, even to the extent of impairing his capital; that the $1,000 so drawn, and other amounts subsequently drawn to pay upon the land, were entered by the bookkeeper in the sales ledger upon the joint account of the two partners, but not upon their accounts in the personal ledger; that the purchase was not made a matter of secrecy, and the purchasers' title appeared of record; that the absent partner was furnished each year with balance sheets of the affairs of the firm and with prompt and full information in regard to the business whenever he sought it; that no examination on behalf of his interest in the firm was made until five years after his death, which occurred about ten years after the purchase in question; and that the land had in the mean time greatly increased in value,— it is *held* that the money with which the purchase was made was rightfully and in good faith withdrawn, without concealment, and that the title to the land was not held in trust for the firm.

APPEAL from the Superior Court of *Milwaukee* County.

This action was brought to obtain a judgment establishing that the legal title to a certain eighty acre tract of land in the town of Greenfield, Milwaukee county, held by the defendants *Bedford B.* and *Edward C. Hopkins,* is held by them in trust for the firm of H. Bosworth & Sons, of which they are members (the plaintiffs being the successors and representatives in interest of Fitch J. Bosworth, the other member of said firm), and for a partition thereof and a sale if necessary, etc., on the ground stated in the complaint, that November 25, 1875, while *Bedford B. Hopkins* and *Edward C. Hopkins* were members of said firm and had entire charge and management of all its affairs and finances, and while the largest part of the capital of the firm contributed by said Bosworth remained in said firm, and while said *Bedford B. Hopkins* was the confidential adviser of

said Bosworth, they secretly, and without the knowledge or consent of said Bosworth, used the funds of said copartnership in the purchase of said land, and thereafter, July 30, 1878, took title thereto in their own names, and have ever since held the same and claim to be the sole owners thereof. It was also charged in the complaint, among other things, that all of the payments for the said tract of land were made out of partnership funds, were secret, and made without the knowledge or consent of Bosworth, while he was in Europe, and in violation of the duties and obligations of the said *Hopkins* brothers as managing partners, and of the articles of copartnership, and that such use of said partnership funds constituted said purchase of said real estate a purchase for the use and benefit of the said partnership.

It appears from the pleadings, and is not disputed by either party, that Fitch J. Bosworth, since deceased, March 1, 1866, entered into copartnership with the defendants the *Hopkins* brothers, in the business of wholesale druggists, at Milwaukee, under the firm name of H. Bosworth & Sons, and in the year 1869 Mr. Bosworth retired from active business, and left Milwaukee and went to Europe. The partnership articles were reduced to writing and executed in 1872, by which Mr. Bosworth was not to devote any time to the business, but the entire business of the firm was to be conducted and managed by the defendants the *Hopkins* brothers. Bosworth was to have up to March 1, 1868, two thirds of the net profits, and from March 1, 1868, to March 1, 1871, three fifths thereof, and from March 1, 1871, to March 1, 1876, one half thereof, and the balance of the net profits was to belong to said *Hopkins* brothers (*Bedford B.* and *Edward C.*). The partnership continued to exist after March 1, 1876, on the same terms, and except that it was then agreed that thereafter said Bosworth should have two fifths of the net profits, and the *Hopkins* brothers

jointly three fifths, until it was dissolved by the death of said Bosworth, February 15, 1885. Mr. Bosworth had contributed almost the entire capital of the firm. In October, 1872, his share amounted to $193,999.18, and that of the *Hopkins* brothers to but $15,000, and, as so agreed, the said Bosworth thereafter took no part whatever in the management of the business of the firm, but its affairs were wholly left to and managed by the *Hopkins* brothers. From October, 1869, up to the time of his death, Mr. Bosworth had other large property interests, consisting of bonds, shares, stocks, and other personal property and valuable real estate, and from that date to the time of said Bosworth's death said *Bedford B. Hopkins* acted as his confidential adviser and agent in reference to his interests outside of the firm, and Bosworth continued to place the utmost reliance in the business ability and integrity of his partners to the time of his death. After leaving Milwaukee in 1869 he never returned, except for two days in 1874, but lived up to the time of his death almost continuously in Europe.

It appeared that by the last will and testament of Bosworth all his real estate and interests therein were devised to his widow, one of the plaintiffs, and to his son, *Howard F. Bosworth*, the other plaintiff, and to his daughter, Emma, one third to each, and that the daughter, Emma, died in 1890, intestate and unmarried, leaving no children, by which her interest in said realty vested in her mother and brother, the plaintiffs in this suit, as her heirs at law. On March 1, 1885, after the death of Bosworth, it appeared from an inventory and balancing of accounts that the assets of the firm after the payment of its debts, and charging to profit and loss all bad debts, amounted and belonged: To said Bosworth's estate, $157,303.53; to *Bedford B. Hopkins*, $38,702.67; and to *Edward C. Hopkins*, $42,296.18; and the plaintiff. *Howard F. Bosworth* purchased of his

mother, *Frances Bosworth*, and his sister, Emma Bosworth, their two thirds in and to his father's interest in the firm, and October 6, 1885, he entered into copartnership with the *Hopkins* brothers, dating from March 1, 1885, each contributing his share in the capital and assets of the former firm as above stated, and this copartnership continued until March 1, 1890, since which date its affairs have been in course of liquidation. Soon after, the plaintiffs caused an examination of the books and affairs of said business to be made by an expert accountant, and in June, 1891, as it is alleged in the complaint, it was learned that the defendants the *Hopkins* brothers had used the funds of the said old copartnership in the purchase of the real estate in question and for the payment of taxes, interest on purchase-money, and for improvements thereon, in amounts stated in the complaint; the purchase having been made November 25, 1875, of Mrs. Alvira Smith, for $16,000, only $1,000 of which was paid down, by check of said firm drawn against its bank account, and the balance was paid when the deed of conveyance was made, July 20, 1878.

The defendants in their answer admitted that they made the purchase and received a conveyance of the lands in question at the time charged, and alleged, in substance, that at the time the net profits of said copartnership business to which they were entitled, pursuant to the partnership agreement, over and above their $15,000 of capital, was about $85,000, and that in making payment for the land, and on account of it, they from time to time made use, to a small degree and proportion, of their share of the profits of said business, drawing against the same, and charging the sums drawn on the books of the firm, the said sums bearing a very small proportion to the net profits to which they were then entitled; that there was no restraint on their right to so draw, and that their partner, Bosworth, at all times knew and assented that they, or either of them,

might at any time draw for purposes of his or their own use any sums within their discretion; and that said sums so drawn were drawn in good faith, within their lawful right, and without any attempt at secrecy or concealment.

The court found facts, in addition to those already stated, in substance and effect, that the entire care and management of the copartnership business was upon said *Hopkins* brothers, and that after the year 1869 said Fitch J. Bosworth gave no attention whatever to the same, except that reports and balance sheets prepared by the bookkeepers were regularly and from time to time sent to him; that after that date *Bedford B. Hopkins* attended to and gave a large portion of his time, care, and attention to managing the individual interests and property of said Fitch J. Bosworth and *Frances Bosworth*, his wife, one of the plaintiffs, in the state of Wisconsin; that, at the time of the making of the contract for the purchase of said lands, said *Hopkins* brothers together had credits with said firm of H. Bosworth & Sons amounting to about $110,000, being about $95,000 in excess of their capital at the time of the commencement of said copartnership; that the use of said money in making said purchase was not in violation of the articles of copartnership; that from the beginning thereof to the date of purchase said Fitch J. Bosworth had drawn largely from time to time from his capital in said copartnership for private investment and speculation, and that it was understood between said parties that the defendants might also, to a reasonable extent and in their discretion, draw upon their interest in said copartnership for private investment; that the use of said sum of $1,000 (the first payment) by said defendants was no violation of their duties as partners in said firm, and that they took said money in good faith, for a private investment which they had a right to make; that when the lands were deeded to

said *Hopkins* brothers, in making payments therefor and on account of the same said *Hopkins* brothers did from time to time make use, to a moderate degree, of their share of the profits and their interest in said business, drawing against the same, and charging the sums drawn on the books of the business; that the sums so made use of were a very small proportion of the net profits to which they were then and there entitled, and that the use of said moneys was not in violation of any agreement or stipulation with the said Bosworth, but that they had a right to draw the same, and said moneys were so used in good faith by said *Hopkins* brothers for their said private investment; that the defendants the *Hopkins* brothers entered into possession of said lands at the time of the contract of purchasé in 1875, and obtained a deed therefor, July 26, 1878; that from the time they so entered into possession to the commencement of this action they were in the actual possession and occupation of said land, through their tenants, claiming title thereto under a land contract for it and deed of conveyance, exclusive of any other right, and that said possession on their part was open and notorious and adverse to any and all claims of any person whatsoever; that said purchase of said lands was in good faith and free from fraud or any intention to defraud, and that they did not at any time conceal, or attempt to conceal, said transaction. It was found as a conclusion of law that said complaint should be dismissed upon the merits, with costs against the plaintiffs, and judgment was entered accordingly, from which the plaintiffs appealed. Such other facts as are material are stated in the opinion.

For the appellants there were briefs by *Miller, Noyes & Miller*, and oral argument by *Geo. P. Miller*.

For the respondents there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *F. C. Winkler* and *J. G. Flanders*.

PINNEY, J.   It is not claimed that the land in question, purchased, as it is charged, with partnership funds, was purchased for partnership uses or purposes, nor that dealing in real estate was in any sense within the scope of the partnership business.   The theory of the case on both sides seems to be that Mr. Bosworth was never consulted and did not concur in or authorize the purchase, or have any knowledge that it had been made, and that the *Hopkins* brothers intended the purchase for their own personal use and benefit, and not for the use and benefit of the partnership.   The testimony shows very clearly that no other intention in point of fact can be imputed to them.   It was contended on behalf of the appellants that a trust *in invitum* should be implied or raised against the *Hopkins* brothers, on the ground of a wrongful or fraudulent use of the funds of the firm in making the purchase, and that they should be held as trustees *ex maleficio* of the title thus acquired for the benefit of the firm; and this is in fact the case made by the complaint.   But it was also insisted that, as the purchase was made with partnership funds, without the knowledge or consent of Bosworth, a trust on this ground alone would result in favor of the firm, independent of any question of wrongdoing or fraud, by reason of such use of the partnership funds.   But we are of the opinion, upon the facts, that there can be no resulting trust in favor of the firm in respect to the premises by reason of the purchase having been made with partnership funds, and that the title or claim of the partnership in or to the lands depends wholly upon raising an implied trust against the defendants, the holders of the legal title, and on the ground that they purchased the lands by a wrongful or fraudulent use of the funds of the firm, so that a court of equity would impute to them, by reason of their wrongdoing and as a means of doing justice, an intention directly opposite to that which they plainly had, namely, that they purchased

it for the firm, when they clearly designed it solely for themselves.

The statute of this state (ch. 96, R. S.) wrought some very important changes in the law of uses and trusts as it existed before it was adopted in 1850. The sweeping provision of sec. 2071, that uses and trusts, except as authorized and modified in ch. 96, were abolished, did not extend "to trusts arising or resulting by implication of law." This would have left trusts resulting from the ownership of moneys paid on the purchase of lands, in a case like this, as before the statute. Secs. 2077–2079 provide, in substance, that when a grant for a valuable consideration shall be made to one person, and the consideration shall be paid by another, no use or trust shall result in favor of the person by whom such payment is made, but the title shall vest in the person named as alienee in such conveyance; but every such conveyance shall be presumed fraudulent as against the creditors of the person paying the consideration, and, when a fraudulent intent is not disproved, a trust shall result in favor of such creditors to the extent it may be necessary to satisfy their just demands; but these provisions do not extend to cases where the alienee named in the conveyance shall have taken the same as an absolute conveyance in his own name, without the knowledge or consent of the person paying the consideration, or when such alienee, in violation of some trust, shall have purchased the lands so conveyed, with moneys belonging to another person. The purpose of the statute, which was taken from that of New York, was to prevent a debtor from defrauding his creditors by buying lands and paying for them with his own money, and taking the title in the name of another, for by doing so under this statute he takes the risk of losing all claim to the land, and creates a trust therein in favor of, and enforceable by, his creditors. *Kluender v. Fenske*, 53 Wis. 122; *Garfield v. Hatmaker*, 15 N. Y. 475. Sec. 2077 does

not seem to embrace the case of a purchase by one partner
without the concurrence of his copartner, using the firm
funds therefor, and taking a conveyance of the title in his
own name, and without the knowledge and consent of such
copartner.    Such a purchase does not appear to be a case
where the consideration is paid by one person, and the
conveyance is taken in the name of another, within the
meaning of this statute.    *Fairchild v. Fairchild*, 64 N. Y.
471, 479.    And, as secs. 2078, 2079 do not seem to have any
application to cases not within the purview of sec. 2077, the
question whether there can be any resulting trust where
one partner purchases with partnership funds, and takes a
conveyance of lands in his own name, without the knowl-
edge of his copartner, remains to be determined as before
the statute.    *Reitz v. Reitz*, 80 N. Y. 538; *Schultze v. Mayor*,
103 N. Y. 308.    And this is in accordance with *Clarke v.
McAuliffe*, 81 Wis. 104.

The question, then, to be determined is whether the pur-
chase in question was made by and through a wrongful
and fraudulent application of the partnership funds, and
without the implied consent of Bosworth resulting from
the knowledge fairly to be imputed to him of all the facts
and circumstances of the case, or an implied acquiescence
on his part in the appropriation.    In *Kelley v. Greenleaf*, 3
Story, 101, STORY, J., declared the law to be " that if a part-
ner fraudulently or improperly, without the consent of his
partners, applies the partnership funds to his own private
purposes, or for his own private profit or emolument, or
invests the same improperly in his own name and for his
own use, the other parties have a right, if they can dis-
tinctly trace the investment, and elect so to do, to follow
the partnership funds into the investment, and treat it as
trust property held by that partner for the benefit of the
firm."    In *Shaler v. Trowbridge*, 28 N. J. Eq. 595, it is held
that the misappropriation must be fraudulent to give rise

to an implied trust in such a case, which may be enforced against the land; and *Partridge v. Wells*, 30 N. J. Eq. 177, 178, will be found, on examination, to be to the same effect. In such a case implied consent, resulting from knowledge of facts and circumstances, or acquiescence in the appropriation, is held sufficient to support the rightfulness of the purchase; and it must necessarily follow that if it is fairly deducible from the evidence that it was within the contemplation or understanding of the parties that Mr. Bosworth on his part, or the *Hopkins* brothers on theirs, might withdraw moneys from the firm, consisting of profits earned, for private uses and purposes, without encroaching upon the capital stock invested, and the purchase in question was made with moneys fairly and in good faith withdrawn and charged to the defendants on the books of the firm, then it is manifest that the purchase in question was rightfully made, and with their own money, and they are entitled to hold it for their own benefit. If lands are purchased by one partner in his own name with partnership funds, and he is charged with the moneys thus used on the partnership books, the land is his private property, and not that of the firm (Bates, Partn. § 284), although the money was drawn from the partnership funds. It was so held by this court in *Clarke v. McAuliffe*, 81 Wis. 104, and is supported by numerous authorities. *Collumb v. Read*, 24 N. Y. 511; *Hay's Appeal*, 91 Pa. St. 265. "It does not necessarily follow that property bought with the money of the firm is the property of the firm, for it sometimes happens that property, although paid for by the firm, has been in fact bought for one partner exclusively, and that he has become debtor to the firm for the purchase money." 1 Lindl. Partn. *329; *Bank of England Case*, 3 De Gex, F. & J. 645–658. It may be shown by express agreement, or from facts and circumstances and conduct of the partners, that land purchased with partnership funds by one partner in

his own name belongs to the partner in whose name the legal title was taken, and that he is, or should be, a debtor for the money. *Smith v. Smith,* 5 Ves. Jr. 193; *Richards v. Manson,* 101 Mass. 482, 484. And in like manner it may be shown that the party so purchasing had a right to draw out and charge himself with the funds with which the purchase was made. Wherever an equity is attempted to be raised and asserted by parol to modify, affect, or displace the legal title, such equity may be rebutted in like manner by parol. In *Kelley v. Greenleaf,* 3 Story, 93, it was held that there must be some element of fraud in the appropriation to enable the firm, by reason of the use of partnership funds, to claim the equitable title to land purchased with them. Mere overdrafts give no right to proceed against the separate estate of one partner thus acquired. The taking and appropriation must have been fraudulent or in bad faith; but the assent of the other copartners to such drawing and use of partnership funds may be implied from the course of business and the habit of the partners in this respect, and acquiescence in the withdrawal of profits may be made for such time and under such circumstances as to justify the inference of a previous understanding or agreement allowing it (Bates, Partn. §§ 318, 319, 545, 546; *Sharp v. Hibbins,* 42 N. J. Eq. 543); and prior similar acts or habit of the firm are evidence of authority for such purpose (*Maybin v. Moorman,* 21 S. C. 346; *Cabaniss v. Clark,* 31 Miss. 423; *McCormick v. McCormick,* 7 Neb. 440; *Russell v. Miller,* 26 Mich. 1). Long delay in making proper examinations or investigation suggested by motives of ordinary business prudence, when the means for making them are readily at hand, extending over a period of many years, until there has been an enormous increase in value of the property claimed, is an important element to be considered as affecting any equity asserted against property so purchased, particularly where, by the death of parties or wit-

nesses, there has been a loss of evidence necessary to a proper investigation of the merits of the claim.

The purchase of the property in question not being within the scope of the business of the partnership, and not having been made with the previous knowledge or consent of all the partners, it cannot be maintained that there was any breach of good faith or of any legal or equitable duty in the defendants in making it; and the sole question is whether, under the facts and circumstances appearing in evidence, the drawing and use of the moneys of the partnership to make the purchase in question, and the entry thereof on the books of the partnership, as hereinafter stated, considered in connection with the habit and course of business of the firm, vested the sole beneficial interest in the property purchased in the defendants, or whether any trust can be implied in favor of the firm against the property so purchased, by reason of any secret or fraudulent use of the money of the firm for that purpose.

Whether any trust is to be implied in favor of the firm from the alleged secret or fraudulent use of its funds in making the purchase depends entirely upon the facts as they existed November 29, 1875, when the purchase was made, and the subsequent withdrawal of funds of the firm and use of the same in payment of the part of the purchase money and interest remaining unpaid and the payment of taxes on and improvement of the land, cannot be regarded as material to the rightfulness of the purchase. *Perry,* Trusts, §§ 126, 133; *French v. Sheplor,* 83 Ind. 266; *Forsyth v. Clark,* 3 Wend. 651; *Botsford v. Burr,* 2 Johns. Ch. 405; *Whiting v. Gould,* 2 Wis. 552. And subsequent wrongful payments on the purchase price from the partnership funds, pursuant to a land contract, but subsequent and prior to the deed, will not be ground for an implied trust, though the firm might, if necessary, have a lien against the land for sums so paid. *Conner v. Lewis,* 16 Me. 274. The pay-

ment of the $1,000 to the vendor, and the execution of the contract for the payment of $15,000 deferred payment and interest, when the defendants were to have a conveyance of the legal title, made them the equitable owners of the fee, subject to the payment of the balance of unpaid purchase money. They owed the vendor that sum, and the subsequent withdrawal of the money with which the notes were purchased, with a part of which this $15,000 was paid, was but a method of obtaining means to pay the debt of the defendants, and was not in any just or proper sense for making a purchase of the lands in question. The amount paid at the time of the purchase was but $1,000, but the entire purchase price was $16,000, and the conveyance of the legal title to the defendants was made July 20, 1878. In view of the fact that the rightfulness of the purchase depends solely on the withdrawal and use of the $1,000 paid when the contract was executed, we are relieved from discussing many questions upon which the evidence is lengthy and computations are complex, particularly in relation to the matter of replacement of funds withdrawn to buy the Daniels notes of one Helmer, with part of which the final payment was made, and whether the defendants made a profit on that purchase for which they ought to account to the firm; and so, too, as to the gains made by the defendant *Bedford B. Hopkins* by withdrawing $5,000 and using it in a speculation of his own. These are all questions which, in our view of the case, relate solely to an accounting to be had between the parties concerning the partnership business, and are not within the scope of this action.

The copartnership commenced March 1, 1866, and continued until the death of Bosworth, February 15, 1885,— a period of nearly nineteen years. The business carried on by them was a very extensive one, and most of the time had been a very profitable one, amounting from $300,000

Bosworth and another vs. Hopkins and others.

to $500,000 per annum.   The defendants had only $15,000 invested in it at first, and Bosworth had contributed the remainder, and nearly the entire amount, so that in October, 1872, when the partnership articles were reduced to writing, the latter had invested in the business $192,231.17, and in the outset a much greater sum, and the defendants only $15,000, as capital.   By these articles it was stipulated that Bosworth was not expected to devote any of his time to the business, that the *Hopkins* brothers had conducted and managed it, and were to do so thereafter; and they were entirely silent as to the right of either or any of the partners to withdraw and use moneys of the firm, whether profits or otherwise.   After the purchase of the land in-question, in March, 1876, another agreement, like the former in all respects, was made, except that the holdings of capital were stated to be: Mr. Bosworth, $193,999.18, and *B. B.* and *E. C. Hopkins*, $101,154.20; and this remained in force until Mr. Bosworth's death.   The latter, in the fall of 1869, a short time before leaving for Europe, wrote to the defendants a letter from the "Kaw-Kaw Clubhouse," relative to his business matters and those of the firm, giving his ideas as to the manner in which the business should be conducted, and concerning his intended trip abroad, which was expressed in terms of great kindness and confidence, in which he says: "For the coming year or two I want you to allow me to do *most of the drawing out of funds for extraordinary purposes, after which you can change it if you desire.*"   There is no allusion to the subject in subsequent letters on either side, and, in consequence of the fact that death had closed the lips of Mr. Bosworth, the law closed those of the defendants as to any oral understanding or agreement between them.   The paragraph above quoted relates to drawing out of money, over and above living expenses, "for extraordinary purposes," and we must refer to it, and the practice and usage of the par-

ties, and all other relevant facts and circumstances, for a solution of the question whether the drawing out of the moneys with which the purchase in question was made and completed was unauthorized and fraudulent.

The evidence is clear, in our judgment, that, when the $1,000 was drawn and used to make the purchase, the *Hopkins* brothers had undrawn profits standing to their credit on the books of the firm in the sum of about $75,000. From 1866 down to the end of the business year 1876 the net profits of the business had averaged over $45,000 per annum, and for the entire period of the partnership $35,000 at least. It appears that nearly every year after going to Europe Mr. Bosworth drew out moneys largely exceeding his share of the annual profits, and in some years more than $20,000 in excess thereof, so that his interest in the firm which stood on the books, March 1, 1871, at $238,574.75, was reduced to $187,643.82 by March 1, 1879, and to $157,303.53 by the end of the partnership term, March 1, 1885, showing that he had not only drawn all his share of the profits, but that his stipulated capital was very considerably reduced below the sum mentioned in the partnership agreement. On the other hand, on the 1st of March, 1879, after final payment had been made for the land, the balance to the credit of the defendants was in excess of their capital as stipulated in the partnership agreement, and at the end of the partnership term, was $80,998.83,— over $20,000 less. During the entire period of the partnership there appears to have been the most cordial and friendly feeling between the parties, each seeming to have the utmost confidence in the other, and at the end of each business year the defendants sent to Mr. Bosworth what is called in the evidence a "miniature balance sheet" of the affairs of the firm for that year, stating the footings of the personal ledger, and amounts due the firm, and amounts the firm owed, the gross sales, gross profits, expenses, net profits, bills receivable,

and stock on hand.   Mr. Bosworth knew presumably what he had drawn out each year, and from this data and the "miniature balance sheets" could form a satisfactory conclusion whether the defendants were withdrawing annually their share of the profits or more, or whether they allowed their profits to accumulate and form a basis with which to carry on the partnership.   The evidence wholly fails to show that any complaint was made by either party against the other for drawing more money annually than he or they ought to have taken, or that the capital of either party had been impaired.   While Mr. Bosworth was abroad or absent from Milwaukee, during a period of about sixteen years, the defendant *Bedford B. Hopkins* was Mr. Bosworth's business manager of his other important interests in Wisconsin, conducting the business of erecting a large building in Milwaukee, and his speculations in whisky and other deals, and his (Bosworth's) profits in these matters during this period are estimated at over $50,000; and *Mr. Hopkins* managed and closed out a transaction in some railway securities, not deemed very secure, in a very profitable and advantageous manner.   He also managed and conducted very important business interests for one of the plaintiffs, *Mrs. Bosworth,* during the same time.   It does not appear that any fault was ever found with, or any complaint was made against, him in respect to his management of any of these affairs, which was, it seems, gratuitous, or in relation to the management of the affairs of the firm by the defendants, until about six years after the death of Mr. Bosworth, and just before this action was commenced.   It is in evidence that Mr. and *Mrs. Bosworth* always had prompt and full information in regard to their said business affairs whenever they sought it.   In 1882 the defendant *Bedford B. Hopkins* saw Mr. Bosworth at the Thousand Islands for eight or ten days.

It is difficult, from all the facts and circumstances in

proof, to resist the conviction that Mr. Bosworth knew in a general way the extent to which he, and the defendants as well, were drawing and had drawn moneys, from time to time, from the firm, both before and after the purchase. He had the means of ascertaining the real facts, and motives of business prudence and ordinary caution should have prompted him to look after the manner in which the defendants, as managing partners, were conducting the affairs of the firm.   The evidence shows that Mr. Bosworth was a competent and successful business man of long and extensive experience, and strict and careful in business methods.   If he did not know the facts, he was exceedingly remiss in not investigating during a period of about thirteen years.   No examination in behalf of the Bosworth interest of the partnership affairs was made until over five years after his death.   The proofs are suggestive of very considerable and long-continued laches in this respect. Laches which will operate to bar relief may well consist in long-continued neglect to investigate and ascertain the rights of a party in respect to important business interests, so that he may be said to have slumbered on his rights quite as well as where a party, having adequate knowledge in this respect, fails to bring his action in proper time for relief.

At the late day when this litigation was instituted, with all the light that can be obtained from the evidence and the course of business and usage of the firm, and in the absence of any evidence or suggestion of complaint at or about the time, and when the evidence of the parties to these transactions cannot now be had, it cannot be said, we think, as an inference of fact, that the drawing out and using of the money of the firm to make the purchase in question, and to pay the deferred payments, interest, taxes, and improvements, was without due and lawful authority.   It would be most unreasonable to say that the plaintiffs have shown

themselves to be in any position to complain of the drawing out of the $1,000 used to make the purchase, when the defendants had to their credit for profits the large amount already stated. Is there any reason, in view of what he said in the Kaw-Kaw letter of 1869, to think it would ever have occurred to Mr. Bosworth to have made any objection to that transaction? Having drawn so largely on the firm for his share of the annual profits, and even to the extent of materially impairing his capital, did he suppose, or had he any right to think, that the defendants were permitting their profits to accumulate · and serve as a ·means with which to secure profits to a considerable extent for his benefit; or did he not think, and have every reason to believe and understand, that they were using their share of profits for purposes of investment and for " extraordinary purposes,"— beyond ordinary living expenses? We feel no difficulty in holding that the $1,000 with which the purchase was originally made was rightfully and in good faith withdrawn and used for that purpose. In view of all the evidence, we are unable to understand how any motive should exist for attempting to conceal the fact, nor does the evidence satisfy us that any concealment of it was intended or attempted. Whether the withdrawal of funds for the purchase of the Daniels notes, amounting to $20,000, for $16,000, with and out of which payment was made of the unpaid purchase money for the land, was an invasion or impairment of the capital of the defendants, was a question much contested, and upon which the finding of the superior court was adverse to the plaintiffs. Our strong conviction is that, if there was any such impairment, it was speedily made good, and that the firm suffered no inconvenience in consequence. But, as already stated, we do not regard this question as important to the real question involved in this action, and will not enter upon an analysis of the computations submitted in favor of the claims of the

respective parties on this point, for, with other matters already mentioned, the appropriate method for settling it is in an action for an accounting, for reasons already stated.

It was argued on behalf of the appellants that the drawing out of the $1,000 with which the purchase was made had been kept secret and concealed, and this furnished evidence of intentional wrong and improper and fraudulent use of the moneys of the firm, and that the same state of facts is shown to be true as to the withdrawal of the subsequent moneys used to buy the notes used to pay the unpaid purchase money on the land, and to pay interest, taxes, and improvements. As to the $1,000, the fact is that this amount and a subsequent payment of interest, etc., were not entered upon the personal account of either of the defendants in the personal ledger of the partners, but was kept on a slip of paper in the money drawer or on the cash tickler until the 24th of the following April, when they were entered on the sales ledger of accounts with customers, under the head of "W. ½ of S. E. ¼, sec. 1, town 6, range 21, Mil. Co., Wis. *B. B. & E. C. Hopkins,* eighty acres, town of Greenfield, Wis." This account was debited with the moneys drawn out and paid for the land, and was credited with whatever had been received from the land. It extends through five ledgers, and it is fair to presume that each of these had an index with which the account could be readily referred to. It would enter into every annual balance sheet as a part of the moneys due, and was in the form of an asset of the firm, though it would be in reduction of the general credits of the defendants, which were kept on the personal ledger. This is the only joint account of the defendants on the firm books, and entries were regularly made on it of all items relating to the land, drawn or paid from the moneys of the firm. In relation to this account one of the defendants testified, in substance, that he never gave any directions to any bookkeeper in what ledger

he should put the *B. B.* and *E. C. Hopkins* land account; that there are several other accounts on the sales or customers' ledger of a like character; that he never noticed that this account was on the sales or customers' ledger until examined as a witness; that he intended no concealment, and there was no concealment, in leaving the $1,000 off the cash book from November 25th down to the next April. One Youmans, bookkeeper for the `firm in the year 1873, and for fourteen years thereafter, testified that the *B. B.* and *E. C. Hopkins* land account was opened by him, and that neither of the defendants gave him any directions as to where that account should be opened,— whether in the sales ledger or in the personal ledger; that they never gave any directions upon what ledger any account should be opened. It appears to us that any competent business man,— certainly any bookkeeper,— in looking into the condition and affairs of the firm, could not fail to find this account, or to understand that the amount with which the defendants were debited by it was a proper charge against the defendants, and a setoff against the interest they had in the firm, whether of capital or profits, and, though in form an asset of the firm, was in effect a charge against the defendants. The method of keeping the account adopted may not have been an appropriate one, but it was not calculated to be a very successful device for concealing the account or the transactions to which it relates; and we are not prepared, in view of all the evidence, to adopt the theory that it was entered in this manner for any such purpose. We do not think the evidence sustains the charge of concealment made in the complaint.

Upon the death of Mr. Bosworth, his son, *Howard F. Bosworth*, one of the plaintiffs, succeeded to his interest in the firm in the manner already stated. There had been no examination into the separate interest of Mr. Bosworth in the affairs of the firm for nearly sixteen years, and none seems

Bosworth and another vs. Hopkins and others.

to have been attempted for about five years thereafter. *Howard F. Bosworth* neither made nor attempted any until about the time the firm went into liquidation, in 1890. It appears that he had little or no business education or training, or aptitude for business pursuits, and the duties incident thereto appear to have been unsuited and irksome to him. There is no evidence that the defendants, or either of them, refused him proper means and facilities to examine into the business transactions of the former firm, or that any means or device whatever was resorted to in order to mislead or deceive him or to prevent a thorough examination of its affairs on his part. He had the means at hand to carry it on, and motives of business prudence and caution could not have failed to suggest its necessity. The defendants did not make the fact of their purchase of the property in question a matter of secrecy, and their title to it appeared of record. The great lapse of time, the loss of instruments of evidence perhaps, but particularly the death of Mr. Bosworth, have served to surround the investigation of the case with difficulty and doubt. We ought not to disturb the title of the defendants under such circumstances, and after such a lapse of time, but upon clear and satisfactory evidence, particularly if there has been, as conceded here, an extraordinary increase of the value of the premises in the mean time. Upon the entire case we are satisfied that the case was decided correctly by the superior court, and that its judgment should be affirmed.

*By the Court.*— The judgment of the superior court of Milwaukee county is affirmed.