McMillen vs. Pratt.

*By the Court.*— Orders affirmed.

McMillen, Respondent, vs. Pratt, imp., Appellant.

*February 8 — March 5, 1895.*

*Sale of undivided interest in pine lands: Division of timber: Contract construed: Partnership to purchase lands: Oral contract: Statute of frauds.*

1. Defendant sold to M. & Co. an undivided half of certain pine lands, and at the same time, by a written contract, agreed to "cut and deliver" to M. & Co. 25,000,000 feet of pine logs of a certain kind and quality, to be taken from said lands, and "to deliver said logs rafted out at the Wolf river boom, free and clear of all liens and incumbrances." M. & Co. were to pay defendant "for cutting, hauling, running, and rafting said logs" the sum of $6 per thousand feet. To secure the performance of such contract defendant was to give, and did give, to M. & Co. two mortgages on his undivided half of the lands, one to be discharged when he had delivered the first 5,000,000 feet of logs according to the contract, and the other to be discharged when he had delivered "25,000,000 feet of logs contracted to be delivered at the Wolf river boom under the contract, free and clear of all costs and charges;" and he covenanted that until the second mortgage was discharged there should remain on the lands not less than 9,000,000 feet of standing timber. The contract further provided that, as soon as the de-

McMillen vs. Pratt.

fendant had delivered the 25,000,000 feet of logs as called for therein, all the remaining pine timber on the lands should be and remain his property, and M. & Co. should give him a bill of sale thereof. Construing together the conveyance to M. & Co., the contract, and the mortgages, in the light of the attending circumstances and the subsequent conduct of the parties, it is *held* that the contract was not a mere lumbering contract, but provided for a division of the timber on the lands of which the parties became tenants in common, and that M. & Co. were entitled to have, and defendant was absolutely bound to cut and deliver to them, 25,000,000 feet of logs of the specified kind and quality, even though that was more than half of the logs of that kind and quality which could be cut upon the lands.

2. Said 25,000 feet of logs were to be cut and delivered within three years and ten months, and by the contract defendant was to build a railroad for the transportation of logs from a lake near the lands in question, and to keep it in operation for seven years; and it was provided that "any purchases of pine lands or standing pine timber tributary to the railroad" should "be bought for and on the joint account of" defendant and M. & Co., each party paying half of the purchase money; that, during the seven years the contract was to run for the transportation of logs, defendant should haul and transport over said railroad all the timber or logs said M. & Co. and he should or might own jointly for a certain sum per thousand feet per mile; that M. & Co. should load, or pay defendant for loading, their half of all logs transported over said railroad which should belong to said M. & Co. and defendant, and should "pay for the transportation of any and all logs they may have transported over said road from lands hereafter to be purchased by said" M. & Co. and defendant on joint account, the aforesaid sum per thousand feet per mile. *Held,* that these provisions for payment by M. & Co. for loading and transporting logs over said railroad did not apply to the 25,000,000 feet of logs which, by the contract, defendant was to cut and deliver at the Wolf river boom "free and clear of all costs and charges."

3. An oral agreement for a partnership for the purchase of lands or standing timber is within the statute of frauds and void, and no action at law for damages for a breach thereof can be maintained. *Treat v. Hiles,* 68 Wis. 344, distinguished.

APPEAL from a judgment of the circuit court for Fond du Lac county: N. S. GILSON, Circuit Judge. *Affirmed.*

This action was for the foreclosure of a mortgage executed by the defendant *Pratt* and wife to R. McMillen & Co., dated August 24, 1885, upon the undivided one-half of certain pine lands in Lincoln and Langlade counties, containing in the entirety about 4,700 acres, to secure the performance of a certain contract entered into between said *Pratt* and the said McMillen & Co. of the same date; the latter having on the same day, as it is stated in the contract, purchased from said *Pratt* an undivided half of the entirety of said lands, and "·one of the considerations of such purchase being that the logs and timber to be cut from said lands *shall be hauled to the Wolf river.*"

By the contract, *Pratt* agreed to build and equip a railroad for the transportation of logs and timber from Lake Pratt (on or near said lands) to Post Lake, in Langlade county, and keep it in operation for the transportation of logs over it for the term of seven years from the date of the contract, and so that not less than 5,000,000 feet of the logs mentioned in the contract should be transported over it in 1886, and that he would "*cut and deliver* to said R. McMillen & Company 25,000,000 feet of pine logs and timber, to be cut and taken from" the lands described in the contract, averaging not more than four and one-half logs to the thousand feet, and in quality to be a fair average of all the pine standing on said lands; not more than five per cent. of said 25,000,000 should be Norway pine; to be cut to the best advantage as logs are usually cut on Wolf river to make good merchantable logs. And he agreed " to deliver said logs rafted out at the Wolf river boom, *free and clear of all liens and incumbrances;* " but said McMillen & Co. were to furnish all boom timber. Five million (more or less) of said logs were to be cut and delivered on or before the early drive of the year 1887, and the full amount was to be cut and delivered within three years and ten months after September 1, 1885. McMillen & Co. were " to pay said *Pratt*

for *cutting, hauling, running, and rafting said logs* in the Wolf river boom the sum of $6 per thousand feet," as follows: When any drive leaves Post Lake, they were to pay *Pratt* $3 per thousand on the woods scale, the balance to be paid as soon as the logs are rafted at the Wolf river boom; and "*the final scale of all logs delivered* shall be the scale made by some competent scaler at the Wolf river boom, as said logs are rafted out of said boom." McMillen & Co. agreed that, "so soon as the logs are rafted and tied out, *they shall be held at their risk and expense.*"

*Pratt* was to execute and deliver to them "two mortgages, of $25,000 each, on *his* undivided half of the lands, conditioned for the performance of the contract on his part." The first mortgage was to be discharged when the first 5,000,000 feet of logs "contracted to be delivered, free and clear from all liens and incumbrances, as therein provided for," was delivered; and the second mortgage (the one in suit) was to be released "when the said *Pratt shall have delivered* to R. McMillen & Co. 25,000,000 feet of logs contracted to be delivered at the Wolf river boom, under the contract, *free and clear of all costs and charges,*" or when said *Pratt* should give other satisfactory security therefor. *Pratt* covenanted and agreed that, until the second mortgage was discharged, "*there shall be and remain on said lands described in the contract not less than nine million feet of standing pine timber;*" and McMillen & Co. stipulated that on demand they would convey to *Pratt* the right of way for said railroad 100 feet in width, without compensation, and also across any other lands they might own, in case of its extension, reserving to themselves the timber standing on the same.

It was also agreed "that any purchases of pine land or standing pine timber, tributary to the railroad [to be built by *Pratt*], shall be bought *for and on the joint account* of *Pratt* and said McMillen & Co.," each party paying half of

the purchase money, and that if, at the time of payment, either party neglected to furnish one half of the purchase price of the same, then the other party might take the entire title clear of any claim by the other; that if either party should, during the continuance of the contract, make such a purchase in which the other at the time did not join, then he should convey or transfer to the other party within that period one half of such lands or timber on being paid one half of the purchase money with eight per cent. interest; that "the cost of looking up or estimating any lands or timber contemplated to be so purchased under this agreement on joint account" should be borne by the parties equally.

During the seven years the contract was to run for the transportation of logs between Lake Pratt and Post Lake, *Pratt* agreed to keep the road in repair and properly equipped, "and haul and transport over said road . . . any and all timber or logs said McMillen & Co. and said *Pratt shall or may own jointly*, for the sum of twelve and one-half cents per thousand feet per mile" for each mile said logs or timber are transported; and that "all logs that shall be transported over said railroad, *which shall belong to said McMillen & Co. and said Pratt*, McMillen & Co. shall load or pay said *Pratt* for loading *their one-half of said logs*, and said *Pratt* shall unload the same in Post Lake without cost to McMillen & Co." And they agreed and bound themselves "to pay for the transportation of any and all logs they may have transported over said road, *from lands hereafter to be purchased by said McMillen & Co. and said Pratt on joint account*, the sum of twelve and one-half cents per thousand feet per mile for each thousand feet *of their one-half* of said logs so transported," etc.

It was also agreed that, as soon as Pratt "shall have delivered the 25,000,000 feet of logs as called for in the agreement, *all the remaining pine timber being and standing on*

McMillen vs. Pratt.

*the lands described in the contract shall be and remain ab-
solutely the property of Pratt,* and McMillen & Co. shall,
on demand, give him a bill of sale of such timber" and a
reasonable time in which to remove it from the lands; that,
if the logs cut from the described lands should be "assessed
to either of the parties, then, in that case, each party agrees
to pay said tax as his actual interest in the said logs shall
be." It was also agreed that, "in case any of the notes this
day given by McMillen & Co. *for the purchase of the un-
divided one-half interest in the above-described lands are not
paid when due, then and in that case this contract shall be
void and of no effect, and each of the parties hereto shall be
released from the fulfilment thereof."* It appears that, at the
date of the contract, *Pratt* conveyed to McMillen & Co. an
undivided one-half of the lands described in it for $100,000,
to be paid according to notes of McMillen & Co., of even
date therewith.

The breach of contract alleged was that *Pratt* delivered
only 18,000,000 feet of logs and timber, and damages were
claimed for failure to deliver the other 7,000,000, at $8 per
thousand feet, amounting to $56,000, with interest; and it
was alleged, as was admitted by the defendant, that the
contract, mortgage, and the interest of McMillen & Co. in
the premises had been transferred to and vested in *Robert
McMillen,* the plaintiff.

The answer, in substance a general denial, sets out, among
other things:

(1) That the defendant cut and removed from the said
lands 36,000,000 feet of logs and timber; that the plaintiff's
half — 18,000,000 feet — was delivered as provided in the
contract, and the value of the logs at Oshkosh was $14 a
thousand; that there remained on the land about 2,500,000
feet, plaintiff's half whereof the defendant was ready and
willing and offered to cut during the logging season of
1888–89, according to the contract, but the plaintiff forbade

him, and thereupon he cut and removed his half thereof; that when the contract was made the parties supposed there was 50,000,000 feet of pine on the land, but there was found to be only about 38,500,000, and, because of said supposition, 25,000,000 feet was the one-half amount designated in the contract to be cut and delivered to the plaintiff.

(2) That February 1, 1888, Seymour Hollister and C. W. Davis, who were copartners of the plaintiff and with him constituted the firm of R. McMillen & Co., sold and transferred all their title and interest in and to said agreement and all other agreements and business arrangements between the defendant and said company to the said plaintiff, who assumed all the obligations and liabilities thereof for the past as well as the future; that the plaintiff was indebted to the defendant for transporting said 18,000,000 feet of logs over his railroad in the sum of $33,782.22, in items as therein specified, and at the rate of twelve and one-half cents per thousand feet per mile, and also in the further sum of $9,000 for loading the same on the cars, at the reasonable rate of fifty cents per thousand feet, which said sums, with interest thereon, as stated in the answer, defendant claimed to recover by way of counterclaim against the plaintiff.

(3) By way of further counterclaim, that on the 24th of August, 1885, for a valuable consideration, and in consideration of the defendant's making and entering into said agreement, and the sale and transfer to said R. McMillen & Co. of an undivided one-half interest in the lands described in the written contract at much less than their actual or market value, the parties made and entered into a certain other contract, by which it was agreed that McMillen & Co. and the defendant would buy all the pine lands and timber tributary to the railroad (and its reasonable extensions) mentioned in the written contract and agreed to be built by the defendant, which could be advantageously purchased to their

joint profit and hauled on the railroad and banked on the Wolf river; that McMillen & Co. were to furnish the necessary money for the purchase of such lands and timber, and transfer to the defendant a half interest therein, upon his paying therefor or giving satisfactory security, and all the pine logs and timber cut from such lands were to be transported and hauled over the railroad, and said McMillen & Co. agreed to pay defendant therefor at the rate of twelve and one-half cents per thousand feet for every mile transported; that the defendant built, constructed, and equipped the railroad as he had agreed to do for logging purposes, and it was reasonably worth the sum of $125,000, and McMillen & Co. and defendant did purchase about 15,000,000 feet of pine timber, and cut and hauled the same to said railroad and over it; that, besides, there were at least 250,000,000 feet of pine timber tributary to said road which could have been advantageously purchased under such agreement for the joint benefit and to the profit of the said parties, and hauled over the railroad and banked on the Wolf river, as McMillen & Co. well knew. The defendant averred readiness and willingness to perform on his part the said contract for the purchase thereof, and alleged that McMillen & Co. and the plaintiff, as assignee, as aforesaid, refused to purchase the same or any part thereof and to perform the said contract on their or his part, although requested; that by reason of the premises and of the defendant's inability to purchase said timber, not having any more logs to ship over said railroad, it depreciated greatly in value, to wit, in the sum of $50,000, and the defendant was prevented from earning twelve and one-half cents per thousand feet per mile for the carriage of said 250,000,000 feet of logs and timber; and that by hauling it the defendant would have realized a profit of $1.50 per thousand feet, and he was also deprived of and lost the sum of $4 per thousand feet for his one-half of said 250,000,000 feet which could have been so

purchased and hauled and banked as aforesaid had McMillen & Co. or the plaintiff performed the contract on their part; and he demanded judgment in the sum of $200,000 damages, with interest on $242,788.22 from the commencement of the action.

The court found, among other things, that the plaintiff, February 1, 1888, succeeded to and became substituted in all respects in the place and stead of McMillen & Co., both as to rights and liabilities under said contract, and became sole owner thereof and of said mortgage; that *Pratt* delivered, before September 1, 1889, 18,000,000 feet of pine timber of the kind and quality and as required by the contract, and no more; that the plaintiff paid him $6 per thousand for the cutting, running, hauling, rafting, and delivering the same at the Bay boom, and did not pay him any other sum for loading or hauling the same on his railroad; that the firm of McMillen & Co. and the plaintiff, on the one part, and *Pratt*, on the other, in their dealings with each other between August 24, 1885, and July 1, 1889, treated said contract as requiring said *Pratt* to cut, haul, load upon the cars at his railroad, and transport and haul thereon the 25,000,000 feet of logs described therein, to be delivered by *Pratt* to McMillen & Co. free and clear of all costs and charges other than the $6 per thousand specified in said contract; that is, they treated said contract as requiring the said *Pratt* to load said logs upon his cars and transport the same over his railroad without any other payment for such loading or transportation than the $6 a thousand specified in said contract, and treated the provision of said contract in this behalf as relating, not to the 25,000,000 feet of pine timber specified in the contract to be delivered before the 1st day of July, and to be cut and taken from the land theretofore owned by said *Pratt*, but as relating only to logs and timber on land which should thereafter be acquired under the terms and provisions of the contract of August 24, 1885.

McMillen vs. Pratt.

It was found that logs of the character and quality described, at the time when they were to be delivered, were of the value of $14 a thousand, and that demand had been made for the 7,000,000 feet not delivered before the 1st of July, 1889. It was further found that no verbal contract was made between *Pratt* and the plaintiff, or between him and R. McMillen & Co., such as is stated in his answer, but that the written contract of August 24, 1885, contains the entire agreement of the parties thereto for the future purchase of pine land or standing pine timber, and that no oral agreement was made for the future purchase of pine land or standing pine timber between the said parties. The plaintiff's damages were found to be the sum of $74,918.67, being $56,000 principal, with interest thereon from July 1, 1889, up to April 1, 1893, at seven per cent. per annum, and afterwards at six per cent. per annum.

As conclusions of law, the court found that *Pratt* was bound to cut and deliver to McMillen & Co., or their assignee, before July 1, 1889, 25,000,000 feet of pine logs and timber of the kind and quality specified in the contract, to be cut by *Pratt*, and rafted out at Wolf river boom, free and clear of all liens and incumbrances and costs and charges, upon the payment of the sum of $6 a thousand feet, which was to include and cover all costs and charges, including loading the same and transportation thereof upon and over said *Pratt's* railroad. Judgment was given of foreclosure in the usual form for the amount so found due, and dismissing all the counterclaims and affirmative causes of action set up by the defendant *Pratt*. The defendant *Pratt*, having alleged various exceptions to the findings, appealed from this judgment.

For the appellant there was a brief by *Bouck & Hilton*, attorneys, and a separate brief by *Hume, Oellerich & Sweet*, counsel, and oral argument by *Gabe Bouck* and *John W. Hume*.

For the respondent there was a brief by *Hooper & Hooper*, attorneys, and a separate brief by *Charles W. Felker*, of counsel, and oral argument by *Moses Hooper* and *Mr. Felker*. They argued, among other things, that the verbal contract, if proven, is void because it relates to an interest in land. *Horsey v. Graham*, L. R. 5 C. P. 9, 13; *Mather v. Scoles*, 35 Ind. 1; *Parker's Heirs v. Bodley*, 4 Bibb, 102–4; *Hocker v. Gentry*, 3 Met. (Ky.), 463; *Watters v. McGuigan*, 72 Wis. 155, 157; *Dunphy v. Ryan*, 116 U. S. 491–6; *Thorp v. Bradley*, 75 Iowa, 50. The following cases are very nearly parallel: *Brosnan v. McKee*, 63 Mich. 454–457; *Raub v. Smith*, 61 id. 543, 548, 549; *Levy v. Brush*, 45 N. Y. 589. See, also, *Clarke v. McAuliffe*, 81 Wis. 104, 107; *Bird v. Morrison*, 12 id. 138; *Popp v. Swanke*, 68 id. 364; *De Moss v. Robinson*, 46 Mich. 62; *Scott v. Bush*, 26 id. 418; *Abell v. Munson*, 18 id. 312; *Hogsett v. Ellis*, 17 id. 364; *Rawdon v. Dodge*, 40 id. 698; *Erben v. Lorillard*, 19 N. Y. 299; *Percell v. Miner*, 4 Wall. 513; *Wetherbee v. Potter*, 99 Mass. 354; *Hain v. Robinson*, 72 Iowa, 735; *Merritt v. Brown*, 21 N. J. Eq. 401. Nor is it taken out of the statute of frauds by part performance. *Blanchard v. McDougal*, 6 Wis. 167; *Brandeis v. Neustadtl*, 13 id. 142.

PINNEY, J. 1. For the purpose of determining whether the defendant was bound to cut and deliver from the lands described in the contract, as an entirety, to McMillen & Co., 25,000,000 feet of logs and timber of the kind and quality therein specified, or only one half of the amount thereon of that kind and quality, whatever that amount might be, less than that quantity, the deed from *Pratt* to McMillen & Co., the notes, the contract, and the two mortgages executed by *Pratt* to McMillen & Co., which were all executed at the same time and all related to the same subject, must be considered and read together. It is evident that they not only relate to the same subject matter but represent a single

transaction. They must therefore be considered and construed together in arriving at what the parties intended by what they have thus expressed. Elph. Interp. Deeds, 7; *Smith v. Chadwick,* 20 Ch. Div. 63. This is really a familiar rule, and there has been no contention against it. The situation of the parties and the subject matter with which the parties were dealing, and the circumstances attending the transaction, are also to be considered, so that the court may be placed in the situation of the parties, so far as may be, so as to consider the transaction in the same light and as far as possible from the same standpoint from which the parties must have regarded it; for, when the language of a contract is susceptible of two meanings, the court will infer the intention of the parties from the circumstances attending the transaction so far as they throw any light upon the language used. *Chicago, M. & St. P. R. Co. v. Hoyt, ante,* p. 314; *Barreda v. Silsbee,* 21 How. 161; *Merriam v. U. S.* 107 U. S. 441; *Chicago, R. I. & P. R. Co. v. Denver & R. G. R. Co.* 143 U. S. 609. And the manner in which the parties have dealt with and treated the subject matter, and the construction they have placed on the instrument, with the actual or presumed knowledge or assent of each other, often have an important bearing on the subject. *Knox Co. v. Ninth Nat. Bank,* 147 U. S. 99, 100.

It appears on the face of the contract, as a fact in view of which the contract was made, that McMillen & Co. had purchased the undivided half of the lands described in it, for the consideration of $100,000, and evidently for the purpose of securing a supply of logs and timber of the particular kind and quality specified in the contract, and to the extent of 25,000,000 feet; and it will be seen that the contract excludes them from the right to have any other quantity of timber from the lands, of whatever kind or quality. This particular quantity *Pratt* was to cut from these lands, and haul or transfer to Wolf river, and finally deliver to

them at the Bay boom, when and where it was to be at their risk, and was all the timber they were entitled to take from the lands. McMillen & Co. had no knowledge of the quality or quantity of timber on the lands. *Pratt* had owned them for over twenty years, and he represented that the lands would cut from fifty-five to sixty millions of pine timber, but not that they would cut that quantity of the quality and kind which by the contract was to be cut and delivered to McMillen & Co.; that the timber could be taken out on certain tributaries of the Wisconsin river; that it would have to be hauled or transported a distance of ten miles to put it into Wolf river, but if taken down that river to Oshkosh, where McMillen & Co. had an extensive door, sash, and blind factory, it would be worth much more than if taken down the Wisconsin river. The legal title to the lands was vested by means of the deed in *Pratt* and Mc-Millen & Co. as tenants in common,— an undivided half in each. Neither owned or had any exclusive right as against the other to any single acre or to any particular tree. The lands, in their entirety, are mentioned as the field from which the logs and timber were to be taken to perform the contract,— that is to say, from the lands of *Pratt* and Mc-Millen & Co.; the quantity not to be measured or limited by what the undivided half of McMillen & Co. would furnish. . The plain stipulation of the contract is that the logs and timber so to be cut " shall average not more than four and one-half to the thousand feet, and in quality shall be *a fair average of all the pine* standing on the lands,— not more than five per cent. to be Norway pine." McMillen & Co. were to have the stipulated quantity, and of the kind and quality, even though it required all of that kind of timber that the land produced; and the agreement is that it shall be cut from the lands held in common, and is absolute and unconditional. The consideration for it is found in the purchase price paid for the lands and the mutual stipulations

of the parties. As security that the stipulated quantity of the nominated kind and quality should be cut from these lands and delivered, the two mortgages on *Pratt's* undivided interest in the lands were given to McMillen & Co.; and, as it was plainly contemplated that *Pratt* should log on the lands in the meantime for his own benefit, he (*Pratt*) agreed that, until the second mortgage (the one in suit) should be discharged, " there shall be and remain on said lands above described not less than 9,000,000 feet of standing timber;" and that " as soon as said *Pratt* shall have delivered to Mc-Millen & Co. the 25,000,000 feet of logs, in the manner and form as called for in this agreement, *all the remaining pine timber* being and standing on the above-described lands shall be and remain the absolute property of said *Pratt;* and said McMillen & Co. shall on demand, after the full completion of the contract, give to said *Pratt* a bill of sale of all such remaining pine timber, and give him a reasonable time to remove the same from said lands."

The substance of the entire matter is that, for the considerations embraced in the contract, the parties made a valid agreement as to the manner in which the timber on the lands held in common *was to be divided*, entirely different from that which would result from the mere fact of their ownership as tenants in common, to wit, McMillen & Co. were to have 25,000,000 feet of the specified kind and quality, and *Pratt* was to have all other timber thereon, more or less, of whatever kind or quality, and they were to remain tenants in common of the land after the timber should be removed. *Pratt's* obligation to cut and deliver this quantity of logs and timber was, as we have said, absolute. He failed to perform it, and was rightly held liable for the damages sustained by such failure. *Pratt* testified that, in getting out the logs, they were cut from lands owned by him and the plaintiff, and, intermingled, were put in Wolf river and rafted out at the boom, and that a division was made between him and

McMillen & Co., he taking his half in feet, and delivering to McMillen & Co. the other half. But the evidence, as a whole, did not establish that there was any formal division in view of a specific claim that each was entitled to an undivided half of all that was cut from the lands, but rather that from time to time he made deliveries of logs under the contract, and retained and disposed of all the rest; that of these he sold to McMillen & Co. 7,000,000 feet. In 1887 and 1888, *McMillen* became suspicious that the timber on the lands was running short, and spoke to *Pratt* about it, but he would not admit it, and said he would furnish the amount on the contract he had agreed to furnish; but it does not appear that *McMillen* knew when he bought these logs that there was or would be a shortage of timber on the lands. There is nothing in this transaction, taken in the way *Pratt* stated it, that would interfere with the right of McMillen & Co. to insist on full and strict performance of the contract as we have construed it. If *Pratt* sold to others, or even to McMillen & Co., the logs and timber he had bound himself to deliver to the latter, this would be no answer to a claim for damages for not performing his contract.

The argument in support of a contrary view ignores this manifest agreement for dividing the timber standing on the lands, and proceeds on the assumption, entirely unwarranted, as we think, that the rights of the parties as mere tenants in common were unchanged by the contract, and upon detached expressions in the contract, from which the inference was sought to be drawn that the contract was one merely for logging and transporting the timber, whatever quantity it might be, that pertained to *McMillen's* undivided interest in the lands. Although ingenious and plausible, we regard the argument as unsatisfactory and unsound. The language of the contract requiring *Pratt* " to cut and deliver " the specified quantity of logs and timber, and of the kind and quality, is of broader import and meaning than the argument as-

McMillen vs. Pratt.

cribes to it. The contract was not a mere lumbering contract. .It secured to McMillen & Co. the right to have the stipulated stumpage, the logs and timber, if to be found on the lands. In this view, the provision of the contract in respect to taxes on the logs is made clear and intelligible; and, as between the parties, McMillen & Co. were to pay the taxes on all logs and timber delivered to them under the contract, and *Pratt* was to pay the taxes on the remainder.

2. The contract in respect to the 25,000,000 feet of logs and timber was required to be performed within three years and ten months from September 1, 1885. The part of the contract (quite distinct, it would seem, from the rest) which related to purchases of pine or pine lands tributary to *Pratt's* railroad, "for and on the joint account of said *Pratt* and said McMillen & Co.," was to continue in force seven years from the date of the contract, and under it lands and stumpage were so purchased, and logs and timber cut, loaded, and transported over the railroad to the amount of about 15,000,000 feet, and until December, 1888, when McMillen refused to longer continue the business. In respect to the loading and transportation of the logs and timber under this joint or company business, provisions were made by which McMillen & Co. were to pay and did pay *Pratt* the stipulated price of fifty cents per thousand feet for loading on the cars, and twelve and one-half cents per thousand feet per mile for transporting their half of such logs and timber, upon bills regularly made and presented. The defendant has interposed a counterclaim for like compensation for loading on the cars and transporting thereon the 18,000,000 feet delivered by him on the contract for cutting and delivering the 25,000,000 feet, under the contract of August 24, 1885, amounting to about $44,000, with interest on the same according to the statement in the answer.

The provisions in the contract relied on to sustain these claims are three, namely, one on the subject of loading logs

and timber on the cars, and two on the subject of transport-
ing them over the railroad, and these two are clearly counter-
parts. By one of them the defendant agrees to transport
over the road "any and all timber or logs said McMillen &
Co. and said *Pratt* shall or may *own jointly*," for the sum of
twelve and one-half cents per thousand feet for each mile
transported; and by the other McMillen & Co. agree to
pay "for the transportation of any and all logs they may
have transported over said road from lands hereafter to be
purchased by McMillen & Co. and said *Pratt on joint ac-
count*, the sum of twelve and one-half cents per thousand
feet per mile" of their one-half of said logs. As to loading
logs on the cars, the agreement is that, "for all logs trans-
ported over said railroad which belong to said McMillen &
Co. and said *Pratt*, McMillen & Co. shall load or pay said
*Pratt* for loading their one-half;" and it was proved that it
was worth fifty cents per thousand to do such loading.

It is clear that the 25,000,000 feet of logs required to be
cut and delivered by *Pratt* to McMillen & Co. do not come
within the purview and meaning of either of these provis-
ions, but that they apply solely and only to the logs and
timber cut from pine or pine lands thereafter to be pur-
chased "on the joint account of *Pratt* and said McMillen &
Co.," under the provision of the contract in respect to that
enterprise. The 25,000,000 feet of logs and timber to be
cut from the lands described in the contract of August 24,
1885, and delivered to *McMillen*, are not fairly within the
description of logs and timber owned by them jointly, or
which belonged to them. McMillen & Co. had paid for the
timber, and had agreed to pay "for cutting, hauling, run-
ning, and rafting said logs in the Wolf river the sum of $6
per thousand feet; . . . McMillen & Co. to furnish at
the Wolf river boom all boom timber for the rafting at the
time the same shall be necessary." All else was to be at
the cost and expense of *Pratt*. Everything that *Pratt*

agreed to do or did do in respect to the 18,000,000 feet of logs was with the view and purpose of a several and *separate* ownership of these logs by McMillen & Co., and had no connection with or relation to a *joint* ownership by them and Pratt. Besides, *Pratt* agreed to cut, haul, run, and raft· these logs all for the sum of six dollars per thousand. Hauling includes transportation on the cars. Indeed, the expression in one of these provisions is " *haul* and · transport over said road." The stipulations as to what *Pratt* was to do in respect to the 25,000,000 feet lead irresistibly to the conclusion that he was to deliver the logs and timber, tied out, so as to be at the risk of McMillen & Co., for six dollars per thousand; and it was expressly agreed that they were " to be delivered rafted out at the Wolf river boom, *free and clear* of all liens and incumbrances;" the first 5,000,000 feet " to be delivered free and clear from all liens as hereinbefore provided;" and, finally, the second mortgage (in suit) was to be released and discharged, " when the said *Pratt* shall have delivered to said McMillen & Co. 25,000,000 feet of logs contracted to be delivered, *free and clear of all costs and charges.*" Besides, it appears that when and as the 18,000,000 feet were delivered from time to time, and bills therefor were rendered, no claim was made for loading or hauling or transporting these logs on the cars; whereas, in the case of the logs and timber loaded and transported on *joint* account, bills were promptly rendered and collected therefor. It is evident from undisputed facts that this counterclaim is without merit.

3. The evidence to establish the verbal contract relied on as a claim for damages for breach thereof was given by *Pratt*, to the effect that on the 24th of August, 1885, he made a verbal contract, soon after signing the written one of that date, and, while holding it in his hand, he turned to *McMillen* and Hollister, and said: " Now, gentlemen, as I understand it, it is, in addition to this written contract, ex-

McMillen vs. Pratt.

pressly understood and agreed that we will buy all of the pine timber in that section of the country tributary to my proposed railroad and its reasonable extensions that can be bought and brought to Wolf river advantageously;" adding: "I to look up and have the timber estimated at our joint expense, and you to furnish the money to pay for it." That he then said to *McMillen:* "*Mac,* is that as you understand it? Do you agree to it?" And he said: "Yes; that is as I understand it. I agree to that." And that Hollister also agreed to it. That this constituted the verbal agreement, and that he would not have executed the written contract if they had not agreed to make the verbal agreement. And other testimony was given tending to corroborate his statement, but this was explicitly denied by both *McMillen* and Hollister, and there was testimony to corroborate their contention. He testified that on account of this verbal agreement he built a standard-gauge road, instead of a narrow one, as he otherwise would have done; the difference in cost being about $70,000. The road and equipment cost $130,000, and he sold it for $75,000; *McMillen* advising him to do so at the time he refused to buy any more pine or pine lands.

The circuit court has found that the verbal contract relied on was not made; that the written contract of August 24, 1885, contains the entire agreement between the parties; and that no oral agreement was made for the future purchase of pine or standing pine timber. An examination of the evidence satisfies us that there is not a preponderance of proof against this finding, and that it ought to be affirmed. It would serve no useful purpose to recapitulate or review the evidence. But it is obvious that the objection that the agreement is within the statute of frauds (R. S. sec. 2302) and void is well taken, and that no action at law for the recovery of damages for its breach can be maintained. *Brandeis v. Neustadtl,* 13 Wis. 158; *Levy v. Brush,*

45 N. Y. 589. An agreement for a partnership in real estate is void unless in writing (*Bird v. Morrison*, 12 Wis. 138); and a sale of standing timber, and an agreement to buy it, are within the statute (*Daniels v. Bailey*, 43 Wis. 566). It is not material to consider what remedies may be had in a court of equity where there has been a part performance of such an agreement, or in actions for fraud or deceit in reference thereto, for at law neither party has any standing to recover damages against the other for a breach of such an agreement. In this case, by the parol agreement, the pine timber and pine lands were the substratum of the alleged projected partnership. "It was agreed," says *Pratt*, "between us, that we would buy all of the pine timber in that section of the country tributary to my proposed railroad and its reasonable extensions that could be bought;" and, as alleged in the counterclaim, "that could be advantageously purchased," one half interest in which was to be transferred to *Pratt* on the conditions stated in the answer. The distinction between the case of *Treat v. Hiles*, 68 Wis. 344, and the present case, is obvious. In *Treat v. Hiles* the real estate to be purchased was not, nor was any interest in it, to become partnership property, and the agreement was simply a partnership or an agreement for a partnership for *working the stone quarry* on the land of one of the parties. And *Hill v. Palmer*, 56 Wis. 123, is in principle the same. The agreement here was for the purchase of an interest in real estate (*Babcock v. Read*, 99 N. Y. 609; *Daniels v. Bailey*, 43 Wis. 566); and not merely for sharing in the profits or losses of a contemplated speculation in such property. We have not been referred to any case where a recovery at law of damages for breach of a verbal contract such as this has been sustained; and the following cases, we think, sustain the conclusion at which we have arrived: *Levy v. Brush*, 45 N. Y. 589; *Dunphy v. Ryan*, 116 U. S. 491; *Parsons v. Phelan*, 134 Mass. 109; *Horsey v. Graham*, L. R. 5

C. P. 9; *Raub v. Smith*, 61 Mich. 543; *Brosnan v. McKee*, 63 Mich. 454; *Bailey v. Hemenway*, 147 Mass. 326. Other objections to this counterclaim were argued, but a consideration of them becomes unnecessary.

It follows that the judgment of the circuit court is correct, and that it should be affirmed.

*By the Court.*— The judgment of the circuit court is affirmed.

As to the validity of a parol partnership for dealing in' real estate, see note to *Bates v. Babcock* (95 Cal. 479) in 16 L. R. A. 745.— REP.