RICHTMAN and others, Respondents, vs. WATSON, imp., Appellant.

*May 17—October 8, 1912.*

*Partnership: Assets: Real estate: Title taken by one partner: Resulting trusts: Implied trusts: Breach of faith: Waiver: Accord and satisfaction: Parol evidence affecting writing: Charitable trusts: Definiteness.*

1. Real estate, not suitable for a particular partnership business nor intended to be or ever is used therein, does not become assets of the firm in equity by mere verbal agreement of the owner, for a consideration, with his partners in such business that it shall be considered such.

2. The foregoing is because, "No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power over or concerning lands or in any manner relating thereto shall be created, granted, assigned, surrendered or declared unless by act or operation of law or by deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same or by his lawful agent thereunto authorized by writing." Sec. 2302, Stats. (1898).

3. Real estate, purchased with partnership money, actually or constructively, for partnership purposes, belongs to the firm though the title be taken in the name of one partner with or without the consent of his associate.

4. If a person purchase land with money of a partnership given him to buy land for the members to hold as tenants in common, taking title in his own name by previous consent, or subsequent acquiescence, the partners cannot claim it on a resulting trust.

5. The rule above stated is because of the abrogation of resulting trusts. Sec. 2071, Stats. (1898).

6. If a person deposit money with another to buy land for such person or to hold upon a charitable trust for a class, and such other invests the money, taking title in form as owner, involving a breach of good faith, an implied trust is created in favor of such person or such class according to the facts.

7. In the circumstances last stated, if the purpose of the deposit is for the depositee to invest the money in property to be held for a class, and a breach of faith committed by not having the deed show the facts be waived by the depositor, that does not

affect the title; as to him, in case of the breach being against. the depositor it changes the implied trust into the common-law field of resulting trusts, leaving the depositor no remedy but to recover back the money, because there is no implied trust, strictly so called, without breach of faith and no enforceable resulting trust.

8. Where two persons close an accord and satisfaction by a contractual receipt in writing, it cannot be varied, contradicted,. or explained by verbal evidence.

9. The rule as to trusts requiring definiteness of scheme and of beneficiaries who can enforce it, does not apply to charitable trusts.

10. In case of a trust for charity, individual beneficiaries may be uncertain and the particular object vague, the latter may be single or broad, only stopping something short of general charity. So the class may be great or small and there may be vagueness in many respects without jeopardizing the trust.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Walworth county: LAWRENCE W. HALSEY, Judge. *Reversed.*

Equitable action to establish title in plaintiffs to an undivided three-fourths interest in certain lands, charge defendants *Wingfield Watson* and Elizabeth White as trustees of such title for plaintiffs, and compel conveyance thereof to them.

The facts upon which plaintiffs grounded their claim are indicated in the epitome of the findings hereafter given.

Defendant *Watson* joined issue as to all allegations in the complaint which, if true, would support plaintiffs' theory as to his holding title in trust for them, and pleaded this: The greater part of the purchase money of the lands in controversy was furnished by defendant Jacob Richtman, father of plaintiffs, under an agreement that it should be invested in land for the welfare of a religious sect, known as the Strangite Branch of the Church of the Latter Day Saints, particularly for any such as might be needy, and the lands have been, and so far as not disposed of are, held upon such trust. The title was, in form, taken in the name of said *Watson* with said

Richtman's consent at the time, or given immediately thereafter. Plaintiffs, after the purchase, became fully informed of the facts and acquiesced therein. Such situation was maintained for years after with approval of plaintiffs and defendant Richtman. The purchase was made without any knowledge that plaintiffs were interested as partners or otherwise in the money furnished therefor. Such money was received for the purpose for which it was used, and all acts in regard to the matter were performed without intent to deceive any one. It was not partnership money nor invested to hinder or delay creditors of defendant Richtman and plaintiffs as partners, nor was fraud intended or perpetrated on such creditors or plaintiffs; but the sole purpose was to hold the title to the lands in trust as before indicated, in which purpose defendant Richtman joined and plaintiffs acquiesced with knowledge of the facts. The deeds sought to be impeached were duly recorded soon after being made and the grantees therein immediately entered into possession of the premises and have ever since so remained, covering a period of more than ten years, adverse to any personal claim of plaintiffs, thus satisfying the statutes of this state as to title by adverse possession, particularly secs. 4211, 4212, 4214, and 4215 thereof. For more than thirteen years prior to commencement of this action plaintiffs knew of such possession and made no objection thereto.

The issues were thus closed: In the spring of 1895, at Sterling Island, state of Missouri, defendant Richtman and plaintiffs, his three sons, formed a copartnership in constructing and operating steamboats and barges on the Mississippi river and its tributaries, taking and executing contracts for river improvements and in mercantile business,—they to be equally interested in all property put into such business and the firm to be responsible for all existing individual liabilities; which property then consisted, in part, of a land contract interest owned by said defendant Richtman in agri-

cultural land, described in the complaint, located near Burlington, Wisconsin, called the "Webber" land, the title to which, pursuant to such contract, was, in June, 1895, conveyed to him, but never to the partnership or members thereof.

Such partnership ended in 1903, all accounts in the meantime being kept and funds handled by defendant Richtman, and all property used in the business, prior to such termination or soon thereafter, used in paying firm liabilities.

After the formation of the partnership and before purchase of the lands in controversy, it was agreed to invest the profits of the business in real estate in the vicinity of Burlington, Wisconsin, for the individual members, so that each might acquire, in his individual right, a farm, none of the land to be taken as partnership property or used in the partnership business, and the lands in controversy were purchased pursuant thereto.

Pursuant to such agreement partnership profits were deposited with defendant *Watson* and therewith he acquired the particular lands. He took title to the land purchased in his own name and has since retained the same, except a portion deeded to his daughter.

Defendant Elizabeth White, without knowledge of her father's actual interest in the land, took title and subsequently, without such knowledge, made valuable improvements on the land.

*Watson* contributed $2,000 in buying the land and the balance, $8,350, was made up of firm money deposited with him by defendant Richtman pursuant to the agreement aforesaid.

*Watson* took the title without intent to claim the property in his own right, or prior authority from the copartners, or any of them, but as matter of convenience in dealing with the property,—not upon the trust claimed in the answer.

Prior to 1900 the partnership business was profitable; but

it then became financially embarrassed and defendant Richt-
man, without consideration, conveyed the land to *Watson*,
which, for eight years, he had theretofore occupied under a
written lease from Richtman, paying rent therefor, and so
continued till 1906, when the property was sold for $9,300,
he receiving the proceeds, and thereafter, March 14, 1907,
paying members of the former partnership $3,000 for use in
discharging its debts, and May 22, 1908, paying defendant
Richtman $3,000 for the same purpose, using $1,000 to sat-
isfy his alleged claim against such defendant for borrowed
money, $2,000, to loan upon note and mortgage to said de-
fendant and wife, $300 to deposit in bank,—the loan and
deposit being in his name.

He has had the use of the land in controversy since
March 1, 1907, and whatever consideration was paid by his
daughter, but has kept up the taxes, though neither the
amount received for such use nor such consideration, nor
amount paid for taxes, appears from the evidence.

Prior to 1905, neither of plaintiffs knew of the status of
the title to said land, and when they learned that *Watson* held
the same they were informed by him and defendant Richt-
man, and believed, that he so held for the use and benefit of
the religious sect to which all parties belonged, known as the
Strangite Branch of the Church of Jesus Christ of the Latter
Day Saints, and were not informed that the title was in his
name, in form, as individual property until 1910.

He has not claimed and does not claim the title in his in-
dividual right, and did not assert, till December 22, 1900, to
hold the same in trust as alleged in the answer; but pretended
to do so as matter of convenience in handling the property.

The trust upon which *Watson* claims the land has not been
declared in writing, except by the answer herein, neither
have the beneficiaries thereof been sufficiently indicated, nor
any method for their ascertainment, nor its object been made

sufficiently certain to enable a court of equity to enforce execution thereof, and it is too intangible and indefinite to be carried into execution.

Watson has not changed his position in respect to the land; relying on acts or conduct of plaintiffs in respect thereto.

Upon such facts these conclusions were reached: The action should be dismissed as to defendants White. The trust under which Watson claims the lands is void. He holds the legal title, so far as not parted with to his daughter Elizabeth, in trust for plaintiffs and defendant Jacob Richtman as tenants in common, subject to an equitable lien for $2,000 in his favor, less any amount realized from the property in excess of taxes and other charges which he has paid. The implied trust upon which he holds the title should be executed by appropriate conveyances, each interest to be subject to its proportionate share of the amount of Watson's lien, to be determined by an accounting in the case. In case of failure to so execute the trust the judgment should operate to pass title in lieu thereof and a certified copy thereof be duly recorded. to perfect the title of record. Judgment was entered in accordance with such conclusions.

For the appellant there was a brief by Louis H. Rohr, attorney, and Simmons & Walker, of counsel, and oral argument by Mr. John B. Simmons and Mr. Rohr.

For the respondents there was a brief by M. L. Fugina and Webber & Lees, and oral argument by Mr. Fugina and Mr. Edward Lees.

The following opinion was filed June 4, 1912:

MARSHALL, J.    The real facts in this case are not in serious dispute on the evidence, and the controversy is governed by familiar principles of written and unwritten law.

The first proposition is this: If a person, having real estate, verbally forms a copartnership with others to conduct a particular business, such real estate being remote from and not

suitable for nor intended to be used as such, or in any form, in such business, agrees that it shall be considered part of the partnership property, does that transfer the title thereto in ·equity so that such partnership or the members thereof can acquire the legal title, adverse to such person· or those claiming under him, or the proceeds of the property, in case of such person having changed such property into some other form, ·or his grantee with notice of the facts having done so?

The stated proposition is involved in the first finding ex-·cepted to and the inferences which the trial court drew there-·from. It is ruled in the negative by sec. 2302, Stats. (1898), providing that "No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power over or concerning lands or in any manner relating thereto shall be created, granted, assigned, surrendered or de-·clared unless by act or operation of law or by deed or convey-·ance in writing, subscribed by the party creating, granting, ·assigning, surrendering or declaring the same or by his lawful agent thereunto authorized by writing."

The case should not be confused with those where real ·estate was bought with partnership money for partnership ·purposes or as an incident to its business. As in *Kyle v. Carpenter,* 130 Wis. 310, 110 N. W. 187. The position of coun-·sel for appellant is sound on that subject.· Nor does it fall within the class covered by the language "by act or operation of law." The proposition contemplates an act by the parties only, involving an agreement of no higher dignity than to ·deal in real estate which has been many times declared void. *Bird v. Morrison,* 12 Wis. 138; *Langley v. Sanborn,* 135 Wis. 178, 114 N. W. 787. No authority is produced which sustains, at all, the affirmative of the proposition, and it is clear that it is not sustainable. So we pass to the second point.

If a person, in forming a partnership with others, to conduct particular business, either at the time thereof or there-·after, pursuant to a verbal agreement, then or thereafter made

with his associates, from time to time takes a part of the net
earnings of the business, not thought to be necessary thereto,
and deposits the same with another to be invested in real
estate, not suitable for or intended to be used in the partner-
ship business, but to be owned by the members as tenants in
common, and such other invests the money pursuant thereto,
either taking the title in his own name by their consent or his
act in that regard is subsequently ratified; do the owners of
the money so invested thereby become equitable owners of the
land as tenants in common?

The court found facts satisfying the elements of the propo-
sition stated as to the particular land in controversy except
that of taking title by *Mr. Watson* in his own name by previous
consent or subsequent ratification.    The only finding thereon
is that plaintiffs did not know anything about the state of the
title till 1905 and were then informed that it was held by
*Mr. Watson* for the benefit of the persons belonging to the par-
ticular branch of the Mormon Church to which all parties be-
longed.    The findings are to the effect that they did not learn
all the facts as to the title till some time after 1905.    Inferen-
tially, from the findings, plaintiffs acquiesced in the situation
in 1905 with that understanding that the title was held by
*Watson* as he then claimed, which is in accordance with the
undisputed evidence.    Moreover, letters written by the re-
spondents before and after 1905 show that they made no per-
sonal claim to the land.    On the whole the record shows that
all the business in relation to the matter was left to Mr. Jacob
Richtman; that he knew all the facts and acquiesced therein,
and conclusively indicates, in our judgment, that it was ex-
pected the title to the land would be vested in some one per-
son.    So the proposition embodies the facts as they appear
from the findings and the substantially undisputed evidence.

While it seems clear there was consent to vesting of the
title in *Mr. Watson* before the land was purchased, at least in
trust for the members of the religious sect to which all the

parties belonged, and the only mistake made, if any, was in not having the deed show he held in trust, the subsequent ratification was equivalent to prior consent. The facts showing acquiescence seem clear, and the law likewise clear. In *Bosworth v. Hopkins,* 85 Wis. 50, 59, 55 N. W. 424, subsequent acquiescence was treated, as matter of course, equivalent to prior authority, and that is elementary.

The proposition explained, as indicated, is ruled in the negative by the statute before referred to as regards the respondents having any right to the land in controversy as tenants in common. On that the court has before spoken. *Clarke v. McAuliffe,* 81 Wis. 104, 51 N. W. 83; *McMillen v. Pratt,* 89 Wis. 612, 630, 62 N. W. 588; *Seymour v. Cushway,* 100 Wis. 580, 76 N. W. 769.

The proposition is also ruled in the negative by sec. 2071, Stats. (1898), abolishing resulting trusts. Formerly if a person deposited money with another for the purpose of having such other invest the same in land, and the purpose of the deposit was executed, title being taken in such other by consent of such person, a trust resulted in favor of such person enforceable in equity. The case in hand should not be confused with those decided where or when the old rule prevailed recognizing resulting trusts creatable by acts of the parties. The statute was expressly designed to abolish such trusts. It provides that "When a grant for a valuable consideration shall be made to one person and the consideration therefor shall be paid by another, no use or trust shall result in favor of the person by whom such payment is made; but the title shall vest in the person named as the alienee in such conveyance" (sec. 2077, Stats. 1898), subject to a constructive trust in favor of creditors under sec. 2078 in case of intent in the transaction having been to defraud them. True, to bring a case within this section, there must be the element of prior consent or its equivalent,—that must not be lost sight of; but there was such here, it seems, as before indicated, by

necessary inference from the findings and the undisputed evidence.

Neither the conclusions of law nor the judgment goes upon the ground that *Mr. Watson* held the property in trust because it was partnership property; the findings negative that; but because it was bought with money set aside to buy land for the individual members of the partnership.    It seems to have been thought that, in any event, whether *Mr. Watson* took title in his own name by consent or not, he became a trustee and would remain so unless respondents lost their right to charge him as such by laches or the statute of limitations.    The findings on the subject seem to treat the time when knowledge came to respondents merely in respect to whether they were guilty of fatal laches.

The conclusions of fact are to the effect that *Mr. Watson* held the land in controversy upon an implied trust for respondents and their father.    There could be no such thing as an implied trust without some element of fraud,—such as *Mr. Watson* taking title in violation of an agreement that it should be vested in the owners of the money,—the respondents and their father, if they were such, or in himself as trustee for the members of the branch of the Mormon Church to which all belong.    Then there would be an implied or constructive trust by the common law, sometimes confused with resulting trusts, strictly so called, mentioned in sec. 2077.    There was no breach of confidence in this case as to respondents personally, if we read the evidence right; but, if it be otherwise, the breach as to them was waived long before this action was commenced.    If there were any breach as to the members of the sect to which the parties belonged, it was also waived as to respondents personally, and, in any event, the right of action to enforce the implied trust did not accrue to them.

The opinion may be read, up to this point, upon the theory that the evidence may be regarded as sustaining the finding to the effect that, by verbal agreement, money was deposited

with *Mr. Watson* to buy land for the benefit of the members
of the partnership as tenants in common and that the land in
question was purchased accordingly, the title being taken in
*Mr. Watson* by previous understanding, implied from the
whole situation, though not with actual knowledge of all the
facts; but, in any event, with subsequent acquiescence in its
not having been taken in the names of respondents and their
father or any of them; but, we quite agree with counsel for
appellant that there is no satisfactory evidence that partner-
ship money was so deposited with such understanding and
that the findings are all wrong in respect to that matter.   In
fact, as we read the record, it is all one way, that the money
deposited with *Mr. Watson* for investment was regarded by
all as tithing money to be held and invested for the use and
benefit of the sect to which all belonged.   Jacob Richtman,
who did all the business with the knowledge of respondents
and makes no complaint, united with *Mr. Watson* in so testi-
fying.   The evidence of respondents and their letter indicate
clearly the same thing.

*Mr. Watson* was induced to remove from Michigan to Wis-
consin by the elder Richtman to do just what he did do, and
he carried out the plan agreed upon with strictest fidelity, as
it seems, for many years.   He was recognized as substan-
tially the head of the sect with authority to exact, collect, use,
and invest tithings, for its benefit.   All were parties to the
arrangement.   To give a full history of this would take much
space, and it will be omitted.   Suffice it, in the main, to say
that the evidence leaves no reasonable doubt on the question,
and the findings, in the latter part, seem to fairly recognize
that they could not have been at all fairly framed without
taking note of this phase of the case, and so it was done after
the first few paragraphs as to the money invested in the land
having been deposited with *Mr. Watson* to buy it for the mem-
bers of the partnership as tenants in common.

Even in the first part of the findings, as we have seen, re-

spondents made no complaint upon learning that the land had
been bought for the benefit of the members of the sect and till
they found out that the deed did not show that fact.    Jacob
Richtman testified fully to the effect that he did all the busi-
ness with *Mr. Watson* and acquiesced in his doing as he did.
The idea that there was any breach of faith in the matter by
Jacob Richtman or *Watson* is negatived by both in the most
emphatic way.    Neither of respondents made any claim to
having any interest in the land for years, but on the contrary,
in writing, declared that they had none.    Both *Mr. Watson*
and Mr. Jacob Richtman said that the purchase money was
mainly collections for church dues.    Respondents admitted
they knew there were dues being sent to *Mr. Watson,* and that
they submitted to being thus burdened.

The record, from beginning to end, shows there were busi-
ness transactions between *Watson* and Jacob Richtman in
connection with the church matters, whereby, on the whole,
private means of the latter, the tithing money, and the for-
mer's private funds became confused together, leading to
some sharp differences of opinion, in time, between the two
men as to the exact situation, which, in the end, were settled,
as we shall see.

No further time will be spent on the branch of the case re-
lating to the character of the money invested by *Mr. Watson;*
but we repeat again that the finding that the land in con-
troversy was bought with partnership funds deposited with
him for investment, as suggested in the findings, is contrary
to the evidence.

The record shows that after the differences had arisen as
aforesaid, which were well known to respondents, and long
after *Mr. Watson* had paid Jacob Richtman $3,000 received
out of the Webber farm, mentioned in the findings,—paid not
thinking it was due him, all the money as he thought having
been given to buy land for the benefit of the members of the
sect to which all belonged,—the two met for the purpose of

making a full settlement. That the purpose was to close up all differences, is evident from what occurred and from the evidence of both—Mr. Richtman acting as he had always done, in his own name, but as head of the Richtman family. Respondents knew his manner of doing business and made no protest. Their whole attitude was that of acquiescence in such matter. At this meeting *Mr. Watson* insisted that Mr. Richtman owed him $1,000 of borrowed money, and the latter claimed he should be paid a considerable sum by the former,—thinking particularly of the money received out of the Webber farm sale some two years previously. Finally Mr. Richtman proposed to call the credit that should be allowed him $4,000 and that, if a settlement were made on that basis, *Mr. Watson* might have any one in Burlington, Wisconsin, draw up a receipt covering all dues and demands whatsoever up to date and he would sign it. That was agreed to with the modification that the latter should be allowed out of the $4,000 the $1,000 of borrowed money. The settlement so agreed upon was carried out, *Mr. Watson* paying Mr. Richtman - $3,000 and the latter signing and delivering to the former a contractual receipt in the following words:

"Nauvoo, Illinois, May 22, 1908. This is to acknowledge receipt of *Wingfield Watson* of $1 and other good and valuable consideration in full payment, discharge and acquittance of all charges, claims and demands against him of whatsoever kind or nature, and I do hereby acknowledge that all accounts and claims between us have been fully discussed, considered and settled and this is a full discharge and settlement thereof.
"In the presence of                    JACOB RICHTMAN.
"Albert Ketchum.
"August Blum."

That, since Mr. Richtman in this transaction, clearly, by the implied assent of respondents, represented them as well as himself, the paper signed made a settlement which could not be impeached except for fraud or mistake, seems clear.

Such is the rule respecting such contracts.    *Conant v. Estate of Kimball,* 95 Wis. 550, 70 N. W. 74.

It seems the whole case might well have been disposed of below, and might be here, on the mere history leading up to the execution of the receipt and such execution.    Manifestly, everything was intended by Mr. Richtman, who had done all the business with *Mr. Watson* on behalf of himself and family, and by *Mr. Watson,* to be included in the settlement. The former loyally stands by such settlement and makes no claim to the land in question and never has in the sense insisted upon by respondents, yet, singular as it may seem, the trial court awarded him an interest therein equal with respondents.    The theory upon which that was done is not perceived.

Notwithstanding the opinion might, as indicated, stop here, it seems best to take notice of some other features of the case. There is a finding that the trust, considering the answer as a declaration in writing in respect to it as to facts therein stated, is void for want of sufficient indication of beneficiaries, or any method for ascertaining them, and because the object is not sufficiently ascertainable to enable the court to enforce it. In that the court fell into the old confusion between charitable and private trusts supposed to have been entirely eliminated from our jurisdiction in *Sawtelle v. Witham,* 94 Wis. 412, 69 N. W. 72; *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345; *Kronshage v. Varrell,* 120 Wis. 161, 97 N. W. 928; *Kavanaugh v. Watt,* 143 Wis. 90, 126 N. W. 672; and other cases.

The trust in this case is a charitable one, if any.    *Mr. Watson,* according to the record, holds the title for the general welfare, in a broad sense, yet limited to some extent, of a particular class of persons *in esse,* which may be changed by dropping out or coming in of members in the natural course of events, but ascertainable at any time, *in præsenti,* by the head of the sect.

Indefiniteness, to a large extent, is one of the characteristics of a charitable trust. "Indeed," as said in *Sawtelle v. Witham,* "vagueness is in some respects essential to a good gift for . . . charity." Courts will not allow such a trust to fail because the objects of the charity are uncertain. The individual beneficiaries cannot well be named. The class may be very small or very large, as said in the cases cited, so may be the purpose. It may be single or may be broad to anything less than general charity, as said in *Kronshage v. Varrell.* If the general limits of the purpose, however broad, within the boundaries mentioned, and also the class, be reasonably ascertainable by the most liberal methods which can be devoted to the matter, though there be great indefiniteness in mode of carrying out the purpose and there be absence of details or even a trustee who is willing to act, and in some cases a trustee at all,—so long as the purpose is within the field of charity in the broadest sense,—the trust is a good one and a way can be found of carrying it out, as said in *Harrington v. Pier.*

The trial court made the findings of fact entirely misconceiving the law in respect to the trust matter. If they were correct they would likely jeopardize many trusts existing and prevent many which would be otherwise probable or possible in the future. Courts tread on almost consecrated ground, so to speak, when dealing with the law of charitable trusts. The subject did not necessarily have anything to do with this case. But being injected into it, occasion has been taken to make observations at some length to prevent the history of the case in the record operating to mislead.

The finding just condemned was doubtless supposed to be essential to a decision in favor of respondents because of previous findings and evidence indicating acquiescence in the state of the title so long as they thought it was held upon a valid trust for the members of the sect to which all belonged.

The case on that subject seems to have been too strong, as before indicated, to be ignored; so, the finding was made to the effect that, if the lands were taken upon a trust, as *Mr. Watson* claimed, and respondents ratified it by not objecting so long as they in good faith supposed he so held the property of record, the trust, in fact, was void.

If it were true that the trust was void as stated in the findings, it is not perceived how that would help respondents. . In that case the title to the land would be in *Mr. Watson,* as we have seen, discharged of the trust.    It would not, to any extent, fall to them and Jacob Richtman as tenants in common, as evidently the trial court supposed, by reason of their furnishing part of the money to buy the land.

There are some other questions, incidentally discussed in the briefs of counsel; but what has been said covers all which from any viewpoint we think best to treat.

*By the Court.*—The judgment is reversed, and cause remanded with directions to dismiss the same with costs.

TIMLIN, J., dissents.

A motion for a rehearing was denied October 8, 1912.